2003 UT App 86

**Beth WALTER, Plaintiff and Appellant,**

v.

**Alan STEWART, Defendant and Appellee.**

**No. 20010866–CA.**

Court of Appeals of Utah.

March 27, 2003.

Kathleen M. McConkie, Wingo & Rinehart, Bountiful, for Appellant.

Todd R. Mecham, Randall L. Skeen, Cook Skeen & Robinson LLC, and Darwin Overson, Overson Flores & Simms LLC, Salt Lake City, for Appellee.

Before BILLINGS, Associate Presiding Judge, BENCH and GREENWOOD, JJ.

## OPINION

BENCH, Judge:

¶ 1 This case arises out of an attorney-client relationship, which turned sexually intimate, between one-time client Beth Walter and her former attorney Alan Stewart. Following her discovery that Stewart was married, Walter filed claims against Stewart for breach of fiduciary duty, fraud, intentional infliction of emotional distress, reckless misconduct, breach of contract, and battery. Upon Stewart's motion, the trial court entered summary judgment against Walter on all of her claims. Walter now appeals. We reverse in part, affirm in part, and remand.

## BACKGROUND

¶ 2 " '[I]n reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.' *Higgins v. Salt Lake County*, 855 P.2d 231, 233 (Utah 1993). We state the facts accordingly." *Collins v. Sandy City Bd. of Adjustment*, 2002 UT 77, ¶ 2, 52 P.3d 1267.

¶ 3 In June of 1998, Walter retained Stewart as her attorney in a divorce action. Through that representation, Stewart learned that Walter was in a "fragile emo-

tional state and [had] personal self esteem issues," including a "doubt[ ][in] her ability to have a successful relationship." Walter decided to relocate to Maryland. In the first part of April of 1999, Walter phoned Stewart several times, anxious that her divorce be finalized so she could move.

¶ 4 During his representation of Walter, Stewart became "very flirtatious, often commenting regarding [Walter's] personal appearance and grooming." In April of 1999, Stewart began to call Walter daily and, on April 15, took her on a lunch date. Following the lunch date Stewart asked Walter, "[I]f you move to Maryland, how are we supposed to have a relationship?" Walter then "decided to postpone the move ... to see where [Stewart's] 'relationship' with [her] would head."

¶ 5 Through the first part of May, Stewart continued to tell Walter "that he was waiting to hear from [her] husband's lawyer to finalize the divorce." On May 12, after personally contacting her ex-husband and the trial court, Walter learned that her divorce had actually been finalized on April 26.

¶ 6 The divorce decree required Walter to pay her ex-husband an amount of money. On May 13, Walter asked Stewart about paying the judgment. Stewart told her "to hold off on payment to see if her ex-husband would pursue collection and further advised [her that] if her ex-husband tried to collect on the amount due, she could make arrangements to pay before a judgment was levied against her." Walter took Stewart's advice and did not make the payment. Also upon finalization of her divorce, Walter desired to resume the use of her maiden name and asked Stewart "why her name change was not reflected in the divorce decree." He told her that she could take the decree to the Department of Social Security to have her name changed, which she did.

¶ 7 Stewart and Walter continued to see each other on a personal basis, and on June 5, 1999, Stewart kissed Walter, tried to undress her, and said that he wanted to "make love." Upon Walter's questioning, Stewart told her that he was a divorced father of four children. The two did not engage in sexual relations that day but did become sexually intimate on July 22, 1999. "On that night as [they] discussed sleeping together, [Walter told Stewart] that she would only do so if they were going to have an exclusive-monogamous relationship, a condition with which [Stewart] readily concurred and agreed to."

¶ 8 During their personal relationship, Stewart took Walter on numerous dates in public as well as on business trips. He never wore a wedding ring. He displayed on his desk an engraved clock that Walter gave him, and wore clothing she gave him. The two also spoke of getting married.

¶ 9 In August of 1999, Walter received an order to show cause for her failure to pay her ex-husband what she owed him under the divorce decree. Walter contacted Stewart, and he said that he would take care of the matter and declined her offer to pay for his services. He then made payment arrangements with the attorney for Walter's ex-husband, and the show-cause hearing was canceled. "For his services rendered and as a token of appreciation, [Walter] bought [Stewart] a [$100] fountain pen."

¶ 10 In October of 1999, Walter considered breaking off her relationship with Stewart. However, when she expressed those feelings to him, he "told [her] that he loved her, that he wouldn't accept [her] breaking up with him and that he would 'stalk [her] and wait for [her] in the parking garage at work.'" They continued to see each other, exchanged Christmas gifts, and spent much of New Years Day 2000 together. Although their dates became less frequent in 2000, Stewart continued to express a commitment to their relationship.

¶ 11 In September of 2000, while pursuing an unrelated international adoption, Walter was told by the Immigration and Naturalization Service that she had illegally resumed use of her maiden name since a name change was not included in her divorce decree. Walter contacted Stewart, who told her that she would need to petition the court to amend the divorce decree. Because Walter's ex-husband would not cooperate in the action, she "retained [Stewart's] services once more to petition the court for a name change and paid him the sum of $350.00."

¶ 12 The hearing on Walter's name change was held on November 2, 2000. "Following the hearing, [Stewart] escorted [Walter] to her car. When they got to the car [he] grabbed [her] around [the] waist and asked her to have sex with him." "Because of the on again-off again nature of [Stewart's] relationship with [her] during the latter half of 2000, [Walter] became curious regarding [his] marital status." In a phone conversation on November 12, Stewart told Walter that he and his wife were back together and that he had not been divorced, but only separated. After their phone conversation, Stewart went to Walter's home and told her that "he reconciled with his wife to be with his children, that he was under discipline by his church for a previous affair, and that he had been living with his mother." Stewart nevertheless expressed a desire to keep in contact.

¶ 13 Over the next four days, Stewart called Walter "approximately four times a day," and, on November 16, took her out to lunch. On the evening of November 16, Walter called Stewart's wife and learned that Stewart had been married for twenty years, had never separated from his wife, had not been disciplined by his church for a previous affair, and that he had not lived with his mother at any time during his affair with Walter. Shortly after Walter's conversation with Stewart's wife, Stewart called Walter and told her that she had ruined his life and then hung up. The two have not spoken since.

¶ 14 Walter filed a complaint against Stewart. Her complaint includes claims for breach of fiduciary duty, fraud, intentional infliction of emotional distress, reckless misconduct, breach of contract, and battery. Stewart moved for summary judgment on all of Walter's claims. The trial court granted Stewart's motion in its entirety, stating simply that Walter's battery claims were barred

by the statute of limitations and that Walter "failed to support by Affidavit facts sufficient to support" her other claims. She now appeals.

## STANDARD OF REVIEW

¶ 15 "Whether the trial court properly granted summary judgment is a question of law that we review for correctness, according no deference to the trial court's legal conclusions." *Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 14, 52 P.3d 1179.[1]

## ANALYSIS

### I. Breach of Fiduciary Duty

¶ 16 "[A]ctions [for breach of fiduciary duty] are grounded on the fundamental principle that attorneys must be completely loyal to their clients and must never use their position of trust to take advantage of client confidences for themselves or for other parties." *Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d 1283, 1290 (Utah Ct.App.1996). "In *all* relationships with clients, attorneys are required to exercise impeccable honesty, fair dealing, and fidelity." *Id.* (emphasis added). Indeed, due to their "professional responsibility and the confidence and trust" that their clients "legitimately repose" in them, attorneys "must adhere to a high standard of honesty, integrity[,] and good faith in dealing with" their clients. *Id.* (quotations and citation omitted). Attorneys are "not permitted to take advantage of [their] position or superior knowledge to impose upon [clients]; nor to conceal facts or law, nor in *any* way deceive [clients] without being held responsible therefor." *Id.* (emphasis added) (quotations and citation omitted).

¶ 17 "The essential elements of legal malpractice based on breach of fiduciary duty include the following: (1) an attorney-client relationship; (2) breach of the attor-

---

1. Walter asserts that "[t]he trial court abused its discretion" by converting Stewart's motion to dismiss into a motion for summary judgment. We disagree. "If, on a motion ... to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for

summary judgment...." Utah R. Civ. P. 12(b); *see also Thayne v. Beneficial Utah, Inc.*, 874 P.2d 120, 124 (Utah 1994). Stewart and Walter submitted affidavits that were not excluded by the trial court. The trial court therefore properly treated the motion to dismiss as one for summary judgment.

ney's fiduciary duty to the client; (3) causation, both actual and proximate; and (4) damages suffered by the client." *Id.*

¶ 18 It is undisputed that an attorney-client relationship existed between Stewart and Walter through at least April of 1999. In May, Walter sought advice from Stewart regarding a sum of money she owed her ex-husband under the divorce decree. Stewart "advised [Walter] to hold off on payment to see if her ex-husband would pursue collection and further advised [Walter that] if her ex-husband tried to collect on the amount due, she could make arrangements to pay before a judgment was levied against her." This evidence, when viewed in the light most favorable to Walter, indicates that both Stewart and Walter anticipated further representation of her in the divorce action. It is undisputed that Stewart later represented Walter on an order to show cause, which came about because of the advice he gave her regarding payment of the judgment. He represented her again in a name change hearing. Therefore, viewing the facts in a light most favorable to Walter, an attorney-client relationship existed between the parties at all relevant times.

¶ 19 As to a breach of the duty owed Walter, the facts viewed in a light most favorable to her indicate that Stewart took advantage of information he gained during his representation of her to initiate first a dating relationship and then a sexually intimate relationship with Walter. He also misrepresented his marital status and the state of her legal affairs for his own interests. Stewart's conduct can be reasonably construed as taking advantage of a client's fiduciary trust through deception. Walter has thus stated facts sufficient to place the element of breach of duty into dispute.

¶ 20 Walter states damages that she claims were caused, actually and proximately, by Stewart's conduct. The reason for the dissolution of the parties' relationship, as well as the timing of that dissolution relative to the damages Walter alleges, raise a reasonable inference supporting both actual and proximate causation. "[C]aus[ation] is an issue of fact, [and] we refuse to take it from the jury if there is any evidence upon which a reasonable jury could infer causation." *Butterfield v. Okubo,* 831 P.2d 97, 106 (Utah 1992). We cannot, therefore, rule against Walter as a matter of law on this element.

¶ 21 Stewart contends that "emotional injury[, un]accompanied by a tangible manifestation of that injury," is not recoverable in a claim for breach of fiduciary duty. Walter, however, has alleged the following damages arising from Stewart's breach of duty: emotional pain, a need for mental health counseling, physical pain, medical bills, loss of employment, and a need for sexual therapy.

¶ 22 Because none of the elements of breach of fiduciary duty can be resolved against Walter as a matter of law, we reverse the grant of summary judgment on this claim.

## II.  Fraud

¶ 23 Stewart argues that Walter's fraud claim can be resolved as a matter of law on either of two bases. Stewart first argues that any misrepresentation of his marital status was immaterial to the sexual relations that allegedly caused damage to Walter. *See Cheever v. Schramm,* 577 P.2d 951, 954 (Utah 1978) (stating the elements of a civil fraud claim). " 'A material fact is any fact, the knowledge or ignorance of which would naturally influence [a party]'s judgment ... in estimating the degree and character of the risk' " involved in a transaction. *Fidelity & Cas. Co. v. Middlemiss,* 103 Utah 429, 439, 135 P.2d 275, 279 (1943) (quoting *Zolintakis v. Equitable Life Assurance Soc'y,* 97 F.2d 583, 586 (10th Cir.1938)). Walter explicitly told Stewart that her participation in sexual relations with him was conditioned on their having "an exclusive-monogamous relationship." Undoubtedly, knowledge of the fact that Stewart was married and living with his wife would have influenced Walter's judgment regarding the risks of their sexual intimacy. These misrepresentations were thus material.

¶ 24 Stewart also challenges the sufficiency of Walter's affidavit in stating damages sufficient to maintain a fraud claim. Although Stewart filed an affidavit in support of his summary judgment motion, it says

nothing in relation to the damages Walter alleges she suffered.[2] "[T]he [rule 56(e)] requirement that a party opposing the summary judgment motion file counter-affidavits applies only when the moving party has elected to and has filed affidavits in support of the motion. If ... the moving party chooses not to or simply fails to file affidavits, section (e) is inapplicable." *Gadd v. Olson,* 685 P.2d 1041, 1045 (Utah 1984). Additionally,

> when a party opposes a properly supported motion for summary judgment and fails to file any responsive affidavits or other evidentiary materials allowed by Rule 56(e), the trial court may properly conclude that there are no genuine issues of fact *unless the face of the movant's affidavit affirmatively discloses the existence of such an issue.*

*Franklin Fin. v. New Empire Dev. Co.,* 659 P.2d 1040, 1044 (Utah 1983) (emphasis added). It follows that an affidavit supporting a summary judgment motion, proffering evidence in contradiction of only some of the opposing party's allegations, does not trigger a requirement that the opposing party proffer evidence supporting those allegations that remain unchallenged. Because Stewart's affidavit contains no evidence contradicting Walter's allegations regarding her damages, Walter may stand on the damages allegations in her complaint for purposes of summary judgment.

■■■ ¶ 25 Because we cannot rule against Walter on these issues as a matter of law, we reverse the grant of summary judgment on her fraud claim.

### III. Intentional Infliction of Emotional Distress

■■■ ¶ 26 In claims of intentional infliction of emotional distress, "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery" and whether "the distress inflicted is so severe that no reasonable [person] could be expected to endure it" are each questions of law "for the court to determine, in the first

instance." *Schuurman v. Shingleton,* 2001 UT 52, ¶ 23, 26 P.3d 227 (quotations and citations omitted). Stewart contends that "[b]ecause Walter cannot establish these [two] elements as a matter of law ... the trial court correctly dismissed this claim summarily."

■■■ ¶ 27 Stewart allegedly used the position of trust he occupied as Walter's attorney, knowledge he gained of her emotional fragility, and misrepresentations about her legal affairs and his marital status, to lure her into a sexual relationship she would not otherwise have engaged in. " '[G]enerally, the case [of intentional infliction of emotional distress] is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" ' " *Retherford v. AT & T Communications,* 844 P.2d 949, 978 n. 19 (Utah 1992) (emphasis omitted) (second alteration in original) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). We conclude that the conduct alleged here is of that general type and can be said to " 'offend against the generally accepted standards of decency and morality.' " *Schuurman,* 2001 UT 52 at ¶ 23, 26 P.3d 227 (quoting *Samms v. Eccles,* 11 Utah 2d 289, 293, 358 P.2d 344, 347 (1961)). It thus meets the threshold necessary to maintain an action for intentional infliction of emotional distress. *Cf. Retherford,* 844 P.2d at 978 (stating that "the conduct that constitutes sexual harassment is per se outrageous" for purposes of intentional infliction of emotional distress).

¶ 28 Stewart contends that the distress alleged by Walter is analogous to that alleged by the plaintiff in *Schuurman,* which distress was held to be insufficient as a matter of law to maintain an action for intentional infliction of emotional distress. *See* 2001 UT 52 at ¶ 25, 26 P.3d 227. There, the plaintiff alleged that the defendant's conduct destroyed her marriage; caused her "severe pain, suffering, and emotional distress"; caused her not to seek "proper treatment for

---

**2.** Nor does Stewart's affidavit say anything regarding the misrepresentations Walter alleges he

made.

her eating disorder and depression"; and would cause her to "incur damages in the future for counseling services." *Id.* at ¶ 5, 26 P.3d 227. The court held that this was "not the type of emotional distress on which a claim for intentional infliction of emotional distress may be based" because it "is indistinguishable from that commonly suffered by others when an intimate personal relationship fails." *Id.* at ¶ 25, 26 P.3d 227.

¶ 29 The emotional distress suffered by Walter allegedly includes not only emotional pain and a need for mental health counseling, but also physical pain, medical bills, loss of employment, and a need for sexual therapy. This level of distress is "[ ]distinguishable from that commonly suffered by others when an intimate personal relationship fails." *Id.* We conclude that it rises to a level that " 'no reasonable [person] could be expected to endure,' " absent compensation, and is thus sufficient to maintain an action for intentional infliction of emotional distress. *Id.* at ¶ 23, 26 P.3d 227 (quoting Restatement (Second) of Torts § 46 cmt. j (1948)).

¶ 30 Because we cannot rule against Walter on these issues as a matter of law, we reverse the grant of summary judgment on her intentional infliction of emotional distress claim.

### IV.  Reckless Misconduct

█ ¶ 31  " 'Reckless misconduct differs from intentional wrongdoing in a very important particular.  While an act to be reckless must be intended by the actor, the actor does not intend to cause the harm which results from it.' " *Matheson v. Pearson,* 619 P.2d 321, 322 (Utah 1980) (quoting Restatement of Torts § 500 cmt. f).  On the other hand, when an actor knows with " 'substantial certainty' " that his action will cause harm, he can " 'be said to intend the harm in which his

act results.' " *Id.* at 323 (quoting Restatement of Torts § 500 cmt. f).

█ ¶ 32 Walter claims reckless misconduct as an "alternative" to her intentional tort claims.  However, her reckless misconduct claim is based on the same allegations that Stewart intentionally misled her in order to engage her in a sexual relationship, thereby nullifying her consent to that sexual contact.  It is beyond question that a person initiating nonconsensual sexual contact must be deemed to know that such contact will be offensive.  Therefore, an actor intending nonconsensual sexual contact also intends offense as a matter of law.  Walter's theory that Stewart intentionally misled her into sexual contact thus fails to put the "reckless" element of reckless misconduct into dispute. For that reason, we affirm the trial court's grant of summary judgment on her reckless misconduct claim.[3]

### V.  Breach of Contract & Battery

█ ¶ 33 Walter articulates for the first time on appeal her breach of contract theory, including the contractual terms she believes Stewart breached.  She does not, however, argue plain error or exceptional circumstances in the trial court's dismissal of that claim.  Likewise, Walter argues for the first time on appeal that her battery claims are not barred by the statute of limitations. Again, however, she does not assert plain error or exceptional circumstances in the dismissal of her battery claims on that basis. We therefore decline to address these issues and affirm the grant of summary judgment on her breach of contract and battery claims. *See Monson v. Carver,* 928 P.2d 1017, 1022 (Utah 1996).

### CONCLUSION

¶ 34 We reverse the summary judgment on Walter's claims for breach of fiduciary duty,

---

**3.**  In her complaint and in her brief on appeal, Walter states this cause of action as one for "negligence or reckless misconduct."  In her complaint, Walter alleges that, in addition to breaching his duty of care by engaging in a sexual relationship with Walter, Stewart "also breached his duty of care ... by allowing the relationship to interfere with his professional judgment and the advice he gave" and also "by the mishandling of her case."  Her complaint

further alleges that she spent $100 on a fountain pen as compensation for his representation on an order to show cause that resulted from his bad advice.  Additionally, she alleges a $350 expense as well as a delay in her adoption proceedings because of Stewart's failure to include her name change in the original divorce decree.  While these allegations may be sufficient to maintain a legal malpractice claim for negligent representation, Walter does not urge this theory on appeal.

fraud, and intentional infliction of emotional distress. We affirm the trial court's summary judgment on Walter's claims for reckless misconduct, breach of contract, and battery. We remand the case for such further proceedings as may now be appropriate.

¶ 35 WE CONCUR: JUDITH M. BILLINGS, Associate Presiding Judge and PAMELA T. GREENWOOD, Judge.