2006 UT App 313

SHAW RESOURCES LIMITED, L.L.C.; Scorpio Energy Resources, L.L.C.; and Comet Resources, L.L.C., Plaintiffs and Appellants,

v.

PRUITT, GUSHEE & BACHTELL, P.C.; Thomas W. Bachtell; A. John Davis III; Robert S. Thompson III; Wind River Resources Corporation; and John Does 1–10, Defendants and Appellees.

No. 20050304–CA.

Court of Appeals of Utah.

July 28, 2006.

Rex E. Madsen, Rodney R. Parker, and Max D. Wheeler, Snow Christensen & Martineau, Salt Lake City, for Appellants.

George M. Haley, David R. Parkinson, Holme Roberts & Owen LLP, Scott A. Call, Thomas R. Karrenberg, and Stephen P. Horvat, Anderson & Karrenberg, Salt Lake City, for Appellees.

Before BENCH, P.J., GREENWOOD, Associate P.J., and BILLINGS, J.

## OPINION

GREENWOOD, Associate Presiding Judge:

¶1 Plaintiffs Shaw Resources Limited, L.L.C., Scorpio Energy Resources, L.L.C., and Comet Resources, L.L.C. (collectively, Plaintiffs) appeal from a summary judgment dismissing the following nine claims with prejudice: (1) breach of fiduciary duty, (2) constructive trust, (3) aiding and abetting breach of fiduciary duty, (4) civil conspiracy, (5) breach of contract/covenant of good faith and fair dealing, (6) negligence in legal representation, (7) interference with prospective economic relations, (8) fraudulent nondisclosure, and (9) misappropriation of trade secrets.[1] Plaintiffs also appeal the trial court's rule 11 sanction dismissing Defendant Robert S. Thompson III.[2] We affirm.

## BACKGROUND

¶2 This case involves oil and gas fields located in Uintah County on the Uintah and Ouray Reservation of the Ute Indian Tribe (the Tribe) in an area known as the Hill Creek Extension. A map of the area at issue is appended to this opinion. The Tribe owns the surface rights and a portion of the mineral rights in the Hill Creek Extension. The state and federal governments each own por-

---

1. Claims five and six were asserted only against attorney Defendants Thomas W. Bachtell and A. John Davis III.

2. Plaintiffs' appeal of the rule 11 dismissal of Thompson is rendered moot by our disposition.

tions of the remaining mineral rights in the Hill Creek Extension.[3]

¶ 3 An area known as Flat Rock Field is located within the 400,000–acre Hill Creek Extension. (Flat Rock Field is designated as B on the appended map.) It consists of tribal surface rights and federal mineral rights. The disputed area, North Hill Creek, is located in the southeastern portion of the Hill Creek Extension, south of Flat Rock Field. (North Hill Creek is designated as C on the appended map.) The Tribe owns both surface and mineral rights in North Hill Creek. The Naval Oil Shale Reserve No. 2 (NOSR–2), consisting of 88,000 acres, lies partly within the Hill Creek Extension. (NOSR–2 is designated as A on the appended map.) Prior to 2001 the federal government owned the mineral rights therein, holding them in reserve for the Navy.

¶ 4 Dan Shaw formed and managed numerous entities to finance the exploration and development of oil and gas wells in Flat Rock Field, including Plaintiffs Shaw Resources Limited, L.L.C. (Shaw Resources) and Scorpio Energy Resources, L.L.C. (Scorpio). Dan Shaw also managed, with his brother, K.C. Shaw, Plaintiff Comet Resources, L.L.C. (Comet), which was primarily a gas and pipeline company created to transport gas. Plaintiffs had similar, but not identical ownership, and although they shared the same manager, they were separate legal entities. In the summer of 2003, John E. Dyer, of Miller Dyer & Company, replaced Dan Shaw as Plaintiffs' manager.

¶ 5 On May 12, 1995, Dan Shaw obtained federal and state mineral lease assignments for oil and gas development rights in Flat Rock Field. He retained the lease assignments exclusively in his name until July 29, 2002, when he assigned them to Shaw Resources. Prior to July 29, 2002, none of the Plaintiffs held record title to leases or development rights in Flat Rock Field.

¶ 6 Dan Shaw employed a geologist, David Allin, to identify new development opportunities. He also contracted with Larry Caldwell to act as the field operator in Flat Rock Field.

¶ 7 During the summer of 1999, Plaintiffs redrilled well 32–5A, which is located in Flat Rock Field, north of North Hill Creek. Plaintiffs assert that the drilling indicated that a potentially significant amount of gas could be located in and around Flat Rock Field.

¶ 8 Conversely, both Allin and Caldwell testified in their depositions that they had not recommended pursuing North Hill Creek because they thought there was greater potential for development to the north. They also testified that they had not recommended gas and oil development activities on tribal land because of potential legal difficulties with the Tribe. Dan Shaw testified that, to his knowledge, neither he, nor any of the Plaintiff entities, attempted to acquire mineral lease rights on tribal property in North Hill Creek or elsewhere.

¶ 9 In a September 15, 1999 letter from Allin to Caldwell, Allin reported on the status of unleased federal mineral rights in Flat Rock Field and other nearby areas. He did not mention the status of unleased *tribal* mineral rights in the area. Allin wrote that he had enclosed a "highly confidential" map known as the "Dakota Structure Map" (the Dakota Map) of unleased federal lands in the area for the purpose of showing Caldwell the area's promising opportunities for development. At the end of the letter, Allin wrote that they would be talking "more about these issues and further research requested on mineral ownership in [Flat Rock Field]." The letter did not mention North Hill Creek or Tribe-owned mineral rights.

¶ 10 On the same date, Allin wrote to the Bureau of Land Management (BLM) regarding the same unleased federal mineral rights. In the letter, he also explained Plaintiffs' drilling activities in Flat Rock Field. He made no mention of North Hill Creek.

¶ 11 Dan Shaw hired Defendant Pruitt, Gushee & Bachtell, P.C. (the Law Firm) on April 5, 1999.[4] Thomas W. Bachtell and A.

---

3. The Hill Creek Extension is in township T15S R20E.

4. Throughout this opinion, we also refer to the Law Firm collectively, to include the individual attorneys named as defendants.

John Davis III were attorneys at the Law Firm. Initially, Dan Shaw retained the Law Firm, and specifically Davis, to represent Plaintiff Comet in a dispute with a party who claimed ownership of and rights-of-way to the Comet pipeline. The April 5, 1999 engagement letter confirmed the Law Firm's representation of Dan Shaw and Comet "and its related entities in . . . matters related to the gas pipeline and facilities owned by Comet in Uintah County." Dan Shaw acknowledged in his deposition testimony that he did not engage the Law Firm to explore or develop oil and gas opportunities.

¶ 12 Defendant Wind River Resources Corporation (Wind River) was a company engaged in oil and gas exploration and development. Bachtell was a shareholder of Wind River during the time at issue. Davis acquired shares in Wind River in February 2000. Wind River's geologist, Marc Eckels, had explored oil and gas production possibilities in the Hill Creek Extension in November 1998. In February 1999, Wind River entered into an agreement with the Tribe to develop NOSR–2, which lies in the northwest section of the Hill Creek Extension, in anticipation of the Tribe one day owning the mineral rights there. During the summer of 1999, as part of Eckels's evaluation of NOSR–2, he evaluated other oil and gas fields in the area, including Flat Rock Field. Eckels obtained a news article from the *Rocky Mountain Region Report,* dated August 10, 1999, that documents the historical performance of well 32–5A, as well as Plaintiffs' intent to redrill it. He also assembled other public records, such as charts and logs documenting data about wells in the Flat Rock Field vicinity, including well 32–5A. The only information Eckels obtained from Plaintiffs was a map of Comet's pipeline that he submitted with an application for a Department of Energy (DOE) grant. Eckels requested the map from Davis, who obtained it from K.C. Shaw.

¶ 13 In October 1999, Eckels applied for a DOE grant to conduct a 3–D seismic survey of the North Hill Creek area. In November 1999, Eckels submitted an application to the Tribe to explore and develop Tribe-owned mineral rights in North Hill Creek. The Tribe agreed to allow him to conduct the seismic survey.

¶ 14 In February 2000, Wind River and Dan Shaw discussed the possibility of sharing the cost of a 3–D seismic survey for both Flat Rock Field and North Hill Creek and pursuing a joint venture to develop North Hill Creek. At this meeting, the Law Firm advised Dan Shaw that members of the Law Firm owned interests in and represented Wind River. The Law Firm sent Dan Shaw a conflict waiver letter seeking his consent and advising him to retain independent counsel. Dan Shaw signed the conflict waiver letter.

¶ 15 Dan Shaw retained the law firm of Jones Waldo Holbrook & McDonough, P.C. to represent him in negotiations with Wind River for sharing costs of the 3–D seismic survey and a possible joint venture. Dan Shaw and Wind River executed an interim agreement for the purpose of cooperating on the 3–D seismic survey and "negotiat[ing] in good faith" toward a joint venture. The parties agreed to share geological information for the survey. Ultimately, neither Dan Shaw nor Plaintiffs entered into a joint venture with Wind River.

¶ 16 In May 2000, Wind River entered into a formal agreement with the Tribe that granted Wind River oil and gas development rights in North Hill Creek.

¶ 17 Plaintiffs filed a complaint against Defendants on February 4, 2004, and an amended complaint on November 2, 2004. In addition to the Law Firm, attorneys Bachtell and Davis, and Wind River, Plaintiffs' complaint also named Robert S. Thompson III as a defendant. Thompson is an attorney who represented the Tribe at one time, and later joined the Law Firm. Plaintiffs sought disgorgement of the oil and gas interests acquired by Wind River, valued at approximately $200 million. The trial court granted a motion dismissing claims against Thompson as a rule 11 sanction. After discovery was completed, the trial court also granted Defendants' motion for summary judgment on all of Plaintiffs' other claims. The trial court cited the following reasons for dismissing Plaintiffs' claims: (1) Dan Shaw was the only real party in interest

and, therefore, Plaintiffs lacked standing; (2) there was no evidence that Dan Shaw or Plaintiffs had any interest in pursuing North Hill Creek as a development opportunity; (3) Wind River utilized no information of Plaintiffs in deciding to pursue North Hill Creek; (4) the Law Firm was not hired by Plaintiffs to look for or identify development opportunities; (5) Plaintiffs Shaw Resources and Comet had no attorney-client relationship with the Law Firm when the alleged breach of fiduciary duty occurred; (6) Plaintiffs failed to state a cause of action against Wind River because there was never a joint venture between them; (7) claims were waived and/or barred by doctrines of estoppel and laches; (8) the claim that rates charged by Wind River on the Comet pipeline were unfair was unsubstantiated; and (9) claims for fraudulent nondisclosure and misappropriation of trade secrets were barred by the statute of limitations.

¶ 18 Plaintiffs appeal.

## ISSUES AND STANDARD OF REVIEW

¶ 19 Plaintiffs contend that genuine issues of material fact exist precluding summary judgment in Defendants' favor. Plaintiffs argue they presented evidence to the trial court suggesting that Defendants breached their fiduciary duty by using confidential information obtained as Plaintiffs' counsel to pursue their own business opportunity developing oil and gas with Wind River, a company in which some of the Law Firm's attorneys held shares.

¶ 20 Summary judgment is appropriate only where "pleadings, depositions, answers to interrogatories, and admissions on file, together with ... affidavits, ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). " 'Whether the trial court properly granted summary judgment is a question of law that we review for correctness, according no deference to the trial court's legal conclusions.' " *Walter v. Stewart*, 2003 UT App 86,¶ 15, 67 P.3d 1042 (quoting *Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62,¶ 14, 52 P.3d 1179). "When ... review[ing] a grant of summary judgment, 'we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party.' " *Hermansen v. Tasulis*, 2002 UT 52,¶ 10, 48 P.3d 235 (quoting *Surety Underwriters v. E & C Trucking, Inc.*, 2000 UT 71,¶ 15, 10 P.3d 338).

## ANALYSIS

¶ 21 Plaintiffs argue that the trial court improperly resolved issues of material fact by: (1) granting summary judgment on the breach of fiduciary duty claim, (2) determining plaintiffs were not the real parties in interest, (3) determining waiver and estoppel applied, and (4) dismissing Plaintiffs' remaining claims. Plaintiffs also contend the trial court erred in dismissing their claims against Thompson. We discuss below the issues of breach of fiduciary duty, real party in interest, and waiver and estoppel. We believe Plaintiffs' remaining issues are resolved in our discussion and analysis.[5]

### I. Whether Plaintiffs Presented Genuine Issues of Material Fact as to Breach of Fiduciary Duty

¶ 22 "The essential elements of legal malpractice based on breach of fiduciary duty include the following: (1) an attorney-client relationship; (2) breach of the attorney's fiduciary duty to the client; (3) causation, both actual and proximate; and (4) damages suffered by the client." *Kilpatrick v. Wiley, Rein & Fielding (Kilpatrick I )*, 909 P.2d 1283, 1290 (Utah Ct.App.1996). On a motion for summary judgment, "once the moving party challenges an element of the

---

5. Our resolution also disposes of Plaintiffs' claims against Wind River. Plaintiffs alleged that the price paid by Wind River for use of Comet's pipeline was unfair. K.C. Shaw negotiated the agreement with Wind River on behalf of Comet. He testified that the price was fair. He also explained that because the agreement allowed Wind River to use the pipeline when and if there was excess capacity, it was terminable, and it provided a "significant benefit" to Comet. K.C. Shaw acted as Comet's agent in the transaction. Therefore, because K.C. Shaw testified in his deposition that the agreement was not detrimental but rather beneficial to Comet, Plaintiffs are now bound by that testimony.

nonmoving party's case on the basis that no genuine issue of material fact exists, the burden then shifts to the nonmoving party to present evidence that is sufficient to establish a genuine issue of material fact." *Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 31, 54 P.3d 1054. The nonmoving party must present "evidence that could be interpreted to satisfy the elements of the claim." *Id.* at ¶ 35. The trial court "must consider each element of the claim under the appropriate standard of proof." *Andalex Res., Inc. v. Myers*, 871 P.2d 1041, 1046 (Utah Ct.App.1994). Moreover, it is also required that "[t]he nonmoving party must submit more than just conclusory assertions that an issue of material fact exists to establish a genuine issue." *Waddoups*, 2002 UT 69 at ¶ 31, 54 P.3d 1054.

¶ 23 In the instant case, Plaintiffs have, we believe, identified material issues of fact on the question of whether there was an attorney-client relationship between Plaintiffs and the Law Firm. Those same issues of fact preclude summary judgment on the issue of Plaintiffs' standing. However, Plaintiffs have not provided evidence to create material issues of fact regarding breach of fiduciary duty, causation, or damages. We discuss each element in turn.

### A. Attorney–Client Relationship

¶ 24 Plaintiffs Shaw Resources and Scorpio argue that disputed facts demonstrate that they had an attorney-client relationship with the Law Firm during the time they allege the Law Firm and its attorneys breached their fiduciary duty. After reviewing the record, we find adequate evidence to support Plaintiffs' claim, thus precluding summary judgment on this element.

¶ 25 Plaintiffs maintain that the Law Firm first represented Shaw Resources and Scorpio, as well as Comet, beginning in April

1999.[6] The engagement letter to Comet stated, in relevant part:

> This letter confirms our engagement to represent you, Comet Resources LLC, *and its related entities* in assisting and advising Comet in the negotiation of gas gathering agreements, gas pipeline maintenance and operation agreements, the transfer of right-of-ways[,] and easements from Questar to Comet and other matters related to the gas pipeline and facilities owned by Comet.

(Emphasis added.) Plaintiffs claim that because Dan Shaw held leases for the Plaintiffs' common benefit and Comet was Shaw's "operating entity," Dan Shaw reasonably believed the Law Firm's representation of Comet encompassed "[Comet's] related entities," Shaw Resources and Scorpio.[7]

¶ 26 Viewed in the light most favorable to Plaintiffs, we believe that the reference to "[Comet's] related entities" could be found by a jury to reasonably refer to Shaw Resources and Scorpio.[8] Indeed, it may well be that there is a duty of loyalty that extends not only to the named or billed client, but also to other related entities of which an attorney has knowledge.

¶ 27 The evidence establishes that Shaw Resources, Scorpio, and Comet were separate legal entities. Nonetheless, representation of Comet may have encompassed issues related to mineral leases in Flat Rock Field and surrounding areas, which in turn may have affected Shaw Resources and Scorpio. As a result, the entities' shared interests may be found by the fact finder to constitute at least an implied attorney-client relationship. *See Kilpatrick v. Wiley, Rein & Fielding (Kilpatrick II )*, 2001 UT 107, ¶ 40, 37 P.3d 1130 ("[T]he proper determination of whether an implied attorney-client relationship exists hinges on whether the party had a *reasonable belief* that it was represented."). We conclude, therefore, that there is material

---

**6.** The parties do not dispute that the Law Firm had an attorney-client relationship with Comet and Dan Shaw as Comet's manager, commencing in April 1999.

**7.** It is undisputed that because Davis provided legal services to Comet, the Law Firm also had an attorney-client relationship with Comet. *See Kilpatrick v. Wiley, Rein & Fielding*, 2001 UT

107, ¶ 82, 37 P.3d 1130 ("Where a law firm represents a client, each individual attorney . . . has an attorney-client relationship with that client.").

**8.** In his affidavit, Dan Shaw explained that he "retained [the Law Firm] to represent me and my related entities."

disputed evidence as to the existence of an attorney-client relationship at the relevant time, between Plaintiffs Shaw Resources and Scorpio and the Law Firm.[9]

### B. Breach of Fiduciary Duty

¶ 28 Plaintiffs assert that Defendants committed legal malpractice by breaching fiduciary duties of confidentiality and loyalty. Legal malpractice "actions are grounded on the fundamental principle that attorneys must be completely loyal to their clients and must never use their position of trust to take advantage of client confidences for themselves or for other parties." *Kilpatrick I*, 909 P.2d 1283, 1290 (Utah Ct.App. 1996) "[A]n attorney's fiduciary duty is twofold: undivided loyalty and confidentiality." *Id.*

#### 1. Duty of Confidentiality

¶ 29 Plaintiffs must present admissible evidence that the Law Firm and its attorneys breached their duty of confidentiality by obtaining confidential information from Plaintiffs. *See Kilpatrick II*, 2001 UT 107 at ¶ 68, 37 P.3d 1130. Additionally, Plaintiffs must present evidence that Defendants communicated this confidential information to others. *See Gildea v. Guardian Title Co. of Utah*, 970 P.2d 1265, 1270 (Utah 1998) ("[W]ithout any evidence that [the defendant] communicated confidential information, [the] conclusion [that defendant breached its duty of confidentiality] is pure speculation and conjecture."). Plaintiffs failed to present nonspeculative or nonconjectural evidence to preclude summary judgment on this element.

¶ 30 Plaintiffs argue that during the fall of 1999, Wind River's focus shifted from NOSR–2, located in the northwest section of the Hill Creek Extension, to North Hill Creek after Plaintiffs shared with Davis the confidential Dakota Map showing a possible gas formation in North Hill Creek and confidential information about the success of their redrilling in Flat Rock Field. Plaintiffs maintain that Davis gave the confidential information to Wind River, which thereafter submitted an application to the Tribe for development rights in North Hill Creek.

¶ 31 Plaintiffs contend the Law Firm obtained the aforesaid Dakota Map that was attached to a September 15, 1999 letter that the Plaintiffs' geologist Allin sent to Caldwell. They further contend that Dan Shaw asked Davis to review the letter and its attachments.

¶ 32 However, the Dakota Map is not included in the record on appeal, and therefore, it is not possible to determine if it contains confidential information or the specifics of that information. Furthermore, relevance of the Dakota Map is speculative because Allin explains in the September 15, 1999 letter that the Dakota Map depicts an area north and east of North Hill Creek. Moreover, this letter, as well as Allin's letter to the BLM, do not refer to North Hill Creek or tribal leases, but to unleased federal and state land, located north and east of North Hill Creek.[10]

¶ 33 In addition, Plaintiffs' argument is speculative. Plaintiffs maintain that the calendar notes of Eckels, Wind River's geologist, September 17, 1999, stating "showed map and progress to Tom [Bachtell] and John Davis. . . . Picked up Comet pipeline map. . . . Discussed Shaw/Flat Rock/DOE/Tribe" confirm that Defendants possessed the Dakota Map. We cannot reasonably infer from these sparse notations, even viewed in the light most favorable to Plaintiffs, that the map is the same Dakota Map referred to in the September 15 letter.[11] Furthermore, the

---

9. As stated earlier, our analysis is also applicable to the issue of whether Plaintiffs were real parties in interest and therefore had standing to file this action. Thus, we hold that there are genuine issues of material fact precluding summary judgment on this issue.

10. Plaintiffs suggest that Davis's billing statement entry dated September 23, 1999, to Comet, which states that Davis "[r]eceive[d] and review[ed] letters from David Allin regarding BLM open and unleased land and request for competitive leases" establishes that Davis reviewed the Dakota Map. There is no evidence to support this inference. Furthermore, Davis's entry likewise refers only to *federal* land.

11. It is more likely that the map depicted Comet's pipeline, and was the same map Eckels needed for his DOE application. Eckels acquired that map through Davis, who obtained it from from K.C. Shaw.

notes indicate that Eckels provided information to Bachtell and Davis about North Hill Creek, not the other way around.

¶ 34 Plaintiffs also attempt to create an issue of fact as to whether Defendants possessed and used confidential information concerning the success of redrilling well 32–5A in Flat Rock Field. Dan Shaw maintains that he communicated confidential information to Davis, including data from the well, its production potential, and Plaintiffs' intent to pursue opportunities in the area.

¶ 35 Plaintiffs fail to establish how this information is either confidential or material. The well activity in Flat Rock Field is not determinative because, even if it indicated production potential in surrounding areas, it does not indicate that Plaintiffs intended to pursue opportunities specifically in North Hill Creek.

¶ 36 Furthermore, Dan Shaw's deposition and affidavit, stating that he gave Davis confidential well data, are unsubstantiated. *See Walker v. Rocky Mountain Recreation Corp.*, 29 Utah 2d 274, 279, 508 P.2d 538, 542 (1973) ("A review of defendant's opposing affidavit reveals no evidentiary facts but merely reflects the affiant's unsubstantiated opinions and conclusions."); *Treloggan v. Treloggan*, 699 P.2d 747, 748 (Utah 1985) (same); *see also Brown v. Wanlass*, 2001 UT App 30, ¶ 7, 18 P.3d 1137 (noting that plaintiff's affidavit must contain more than "his own unsupported speculation.").

¶ 37 To present evidentiary facts supporting Dan Shaw's affidavit, Plaintiffs provide Davis's extensive handwritten notes, and in particular, Davis's written statement that "all leases now in Orion and Comet.... Now embarking on drilling program." The notes are not specific enough to indicate that Dan Shaw told the Law Firm about the success of the well, or any intention to obtain tribal leases. As such, they also fail to present material facts. *See* Utah R. Civ. P. 56(c) (stating that a summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact"). Moreover, the well drilling data is not confidential because it is available

in public records. Defendants provided a news article about the well data in Flat Rock Field as well as charts and logs interpreting that data. Indeed, Eckels's analysis and recommendations refer only to publicly available data.

¶ 38 Again, to demonstrate that Dan Shaw gave the Law Firm data about their successful well drilling and their plans to pursue tribal leases and oil and gas opportunities in North Hill Creek, Plaintiffs present billing invoices from Defendants with charges to Comet for phone consultations between Davis and Dan Shaw in March and April 1999. However, the invoices do not indicate what was discussed between Davis and Dan Shaw, except to refer to Comet's pipeline issues. As such, they lack materiality. *See id.*

¶ 39 In addition, Plaintiffs failed to provide evidence that the Law Firm and/or Wind River *used* Plaintiffs' confidential information for its pursuit of development in North Creek Hill. Yet, Plaintiffs argue that shortly after Davis reviewed the September 15 letters, and the Law Firm met with Eckels to discuss "Shaw/Flat Rock/DOE/Tribe," Eckels and Wind River "suddenly shifted [their] focus from NOSR–2 to North Hill Creek."

¶ 40 The only evidence regarding Defendants' interest in North Hill Creek comes from affidavits and evidence that Wind River had been exploring this area before the Law Firm was hired by Comet. As part of Eckels's evaluation of Flat Rock Field, he collected public data about the wells in the area. Eckels learned that the DOE was providing grants for 3–D Seismic surveys on tribal lands. Because the Tribe owned only the surface rights to Flat Rock Field, Eckels explored other areas, and learned of Tribe-owned mineral and surface rights in North Hill Creek as an alternative. In November 1999, Eckels submitted an application to the Tribe for Wind River to develop and explore North Hill Creek. There is no admissible evidence that Wind River's activities in North Hill Creek were generated in any part by information obtained from Plaintiffs through the Law Firm.

¶ 41 Consequently, Plaintiffs' attempt to present genuine issues of material fact that Defendants acquired and used allegedly confidential information fails under rule 56(c). *See* Utah R. Civ. P. 56(c).

### 2. Duty of Loyalty

¶ 42 Plaintiffs also allege that Defendants breached their duty of loyalty to Plaintiffs by using Plaintiffs' confidential information for their own oil and gas exploration and development in North Hill Creek in direct competition with Plaintiffs. Specifically, they allege that Davis, after acquiring confidential information from Plaintiffs, gave it to Bachtell and Wind River. Plaintiffs claim that the Law Firm represented them despite its interest in Wind River, a company in which some members of the Law Firm held shares, and that the Law Firm did not disclose its interest in Wind River. In contrast, Defendants maintain that they did not breach the duty of loyalty to Plaintiffs because the Law Firm was not hired to find oil and gas development opportunities for Plaintiffs.

■■ ¶ 43 We believe Defendants understate the scope of Plaintiffs' allegation of breach of loyalty. "In all relationships with clients, attorneys are required to exercise impeccable honesty, fair dealing, and fidelity." *Kilpatrick I,* 909 P.2d 1283, 1290 (Utah Ct.App.1996). Attorneys are also " 'not permitted ... to conceal facts or law, nor in any way deceive [a client] without being held responsible therefor.' " *Id.* (quoting *Smoot v. Lund,* 13 Utah 2d 168, 369 P.2d 933, 936 (1962)).

■ ¶ 44 It is undisputed that the Law Firm was hired to provide legal representation, rather than to find oil and gas development opportunities. However, insofar as some of the circumstances in this matter raise the potential for a possible breach of loyalty, we agree with Plaintiffs. When a law firm represents clients in the same business and geographic area, it owes great caution to clients in maintaining their confidentiality and loyalty. That is even more true when attorneys in the law firm have personal stakes in clients' businesses or in similar businesses. Nonetheless, the evidence here does not allow us to conclude that Defen-

dants breached their duty of loyalty to Plaintiffs because Plaintiffs have failed to specifically identify material facts and have provided arguments based only on speculation or "conclusory assertions." *Waddoups v. Amalgamated Sugar Co.,* 2002 UT 69,¶ 31, 54 P.3d 1054; *see also Andalex Res., Inc. v. Myers,* 871 P.2d 1041, 1047 (Utah Ct.App. 1994) (*holding court cannot draw inferences based on* "doubtful, vague, speculative, or inconclusive evidence."); *Treloggan v. Treloggan,* 699 P.2d 747, 748 (Utah 1985) (stating that an "affidavit on information and belief is insufficient to provoke a genuine issue of fact."). As discussed above, there is no record support for Plaintiffs' contention that they conveyed confidential information to Defendants or that Defendants used the confidential information for their own benefit and to the detriment of Plaintiffs. Therefore, Defendants' alleged breach of their duty of loyalty to Plaintiffs is merely hypothetical, and thus inadequate to defeat the motion for summary judgment.

### C. No Material Disputed Facts that the Alleged Breach of Fiduciary Duty Could Have Caused Plaintiffs' Injury

■ ¶ 45 Even if we assume that Plaintiffs conveyed confidential information to Defendants and that Defendants breached their fiduciary duty to Plaintiffs by allegedly giving the information to Wind River to promote Defendants' own business opportunities, Plaintiffs do not present genuine issues of material fact that they were thereby injured.

■ ¶ 46 In order to show injury, Plaintiffs must present evidence that were it not for the Defendants' breach, they would have successfully pursued oil and gas development in North Hill Creek. "In legal malpractice actions based on breach of fiduciary duty, clients must show that if the attorney had adhered to the ordinary standards of professional conduct and had not breached fiduciary duties, the client would have benefitted." *Kilpatrick I,* 909 P.2d at 1291 (emphasis omitted).

¶ 47 Plaintiffs do not provide evidence that they considered North Hill Creek a develop-

ment opportunity prior to February 2000, when Wind River approached them. Allin and Caldwell both testified that Plaintiffs were not interested in North Hill Creek because they did not want a political entanglement with the Tribe and thought opportunities were better north of Flat Rock Field, instead of south, where North Creek Hill was located.

¶ 48 Furthermore, Allin's September 15, 1999 letters to Caldwell and the BLM indicate that Plaintiffs were interested in leasing *federal* land, not tribal land, in or around Flat Rock Field. The letters did not mention North Creek Hill. Allin's letter to Caldwell states he is enclosing a copy of the Dakota Map to help Caldwell visualize "why some of the open Federal lands in the north western area of T15S R20E look so inviting as well as acreage in Sunday School Canyon." Plaintiffs assert the last sentence of this letter indicates an interest in exploring North Hill Creek. The sentence reads: "We will be talking more about these issues and further research requested on mineral ownership in T15S R20E." The substance of the letter that Davis reviewed concerned federal leases. The brief reference to the township containing both federal and Tribe-owned mineral rights, in light of the rest of the content regarding federal land, and in the absence of other evidentiary facts, is inadequate. It is also inconsistent with the deposition testimony of Allin and Caldwell that they did not consider North Hill Creek a promising site for exploration and did not want to negotiate with the Tribe.

¶ 49 In addition, after Wind River's contact with Plaintiffs in February 2000, Plaintiffs declined to enter into a joint venture after the test drilling. Significantly, Dan Shaw signed the conflict waiver letter from the Law Firm, and obtained separate legal counsel. This evidences a lack of interest in pursuing development in North Hill Creek after having full knowledge of Wind River's interest and activities in North Hill Creek.

¶ 50 Having failed to present evidence of causation, Plaintiffs likewise did not present material issues of fact regarding damages. Consequently, although there are material issues of fact concerning an attorney-client relationship, Plaintiffs have not presented evidence of material issues of fact on the remaining elements of breach of fiduciary duty. Thus, summary judgment was proper.

## II. Waiver and Estoppel

¶ 51 Plaintiffs argue that the trial court erred in granting summary judgment on the basis of waiver and estoppel. They assert that disputed material facts preclude summary judgment.

¶ 52 Plaintiffs cite rule 1.8 of the Utah Rules of Professional Conduct, entitled Conflict of interest: prohibited transactions.[12] The rule states:

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client; and

(2) The client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) The client consents in writing thereto.

(b) A lawyer shall not use information relating to representation of a client to the

12. We note that the Scope section of these rules includes the following statement: "Violation of a Rule should not give rise to a cause of action, nor should it create any presumption that a legal duty has been breached.... [The Rules] are not designed to be a basis for civil liability." Utah R. Prof'l Conduct (2005). *See also Kilpatrick v.* *Wiley, Rein & Fielding,* 909 P.2d 1283, 1291 n. 3 (Utah Ct.App.1996) (stating that the Utah "Rules of Professional Conduct are not a basis for civil liability."). Nevertheless, the then-current rule 1.8 was considered by the supreme court in *Margulies v. Upchurch,* 696 P.2d 1195, 1201–02 (Utah 1985), cited herein.

disadvantage of the client unless the client consents after consultation.

Utah R. Prof'l Conduct 1.8 (2005).

 ¶ 53 "A waiver is the intentional relinquishment of a known right. To constitute waiver, there must be an existing right, benefit or advantage, a knowledge of its existence, and an intention to relinquish it." *Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 942 (Utah 1993) (quotations and citation omitted). A defense based on equitable estoppel bars recovery if (1) a party acts or fails to act in a manner that is inconsistent with a subsequent claim, (2) a second party reasonably acts or does not act because of the first party's original act or failure to act, and (3) the second party would suffer injury if the first party were allowed to repudiate such act or failure to act. *See CECO Corp. v. Concrete Specialists, Inc.*, 772 P.2d 967, 969–70 (Utah 1989).

¶ 54 Plaintiffs refer us to *Margulies v. Upchurch*, 696 P.2d 1195 (Utah 1985), in which the supreme court cited to the then-current version of the Code of Professional Responsibility. *See id.* at 1201–02. The supreme court agreed with the trial court's statement that "[t]he law has long recognized that an attorney is held to the highest duty of fidelity, honor, fair dealing and full disclosure to a client." *Id.* at 1201. The supreme court then determined that a necessary component of full consent to a conflict of interest requires full disclosure of the "nature and implications of the conflict in enough detail so that the parties can understand." *Id.* at 1203–04.

 ¶ 55 In the instant case, the Law Firm argues that Dan Shaw's signing of the February 11, 2000 conflict waiver letter and discussions between the Law Firm and both Dan and K.C. Shaw constitute adequate waiver and equitable estoppel under Utah case law. Plaintiffs, however, assert that disclosure by the Law Firm was inadequate to provide full knowledge of the rights being waived. We disagree.

 ¶ 56 When Dan Shaw signed the conflict waiver letter he knew that (1) the Law Firm had not previously informed him of a business opportunity in North Hill Creek, (2) the Law Firm represented Wind River and some of its partners had invested in Wind River, (3) Wind River intended to pursue development of oil and gas production in North Hill Creek and was negotiating with the Tribe for leases, and (4) Wind River had offered to enter into a joint venture with him and/or his business entities for North Hill Creek exploration. Dan Shaw also testified he was aware that Wind River was prepared to expend significant sums of money to explore opportunities in North Hill Creek. These facts are established by the letter's contents and Dan Shaw's deposition testimony.[13] Armed with this knowledge, Dan Shaw did not object to any past or future action of the Law Firm and affirmatively waived any conflict of interest occasioned by the Law Firm's representation of Wind River. The waiver is further evidenced by Plaintiffs' declining to enter into a joint venture with Wind River when the opportunity was presented. Furthermore, Dan Shaw continued to use the Law Firm as counsel for the oil and gas-related businesses he managed until 2003, when he was replaced. The Law Firm relied on the waiver by continuing to represent Wind River.

¶ 57 It is undisputed that investment in oil and gas exploration has inherent risks. Silently waiting for the results of such exploration also carries risks. In *Pfister v. Cow Gulch Oil Co.*, 189 F.2d 311 (10th Cir.1951), the court stated:

A person may not withhold his claim awaiting the outcome of a doubtful enterprise and, after the enterprise has resulted in financial success favorable to the claimant, assert his interest, especially where he has avoided the risks of the enterprise. . . .

13. Plaintiffs attempt to create a factual dispute based on Dan Shaw's testimony that he was told Wind River had a confidential relationship with the Tribe and an exclusive right to lease mineral rights from the Tribe. They contend that this means the Law Firm implied they had a done deal with the Tribe. However, K.C. Shaw stated in his affidavit that the Law Firm said Wind River had no written agreement with the Tribe as of February 11, 2000, and that Bachtell was still negotiating with the Tribe for a final agreement and formal approval. A disputed fact cannot be created by implication when actual evidence is to the contrary.

Where a plaintiff, with knowledge of the relevant facts, acquiesces for an unreasonable length of time in the assertion of a right adverse to his own, the court may presume assent to the adverse right, and the consequent waiver of the right sought to be enforced.

*Id.* at 315.

¶ 58 As argued by Defendants, the same principle applies in legal malpractice actions. *See Marsh v. Whitmore,* 21 Wall. 178, 88 U.S. 178, 184, 22 L.Ed. 482 (1874) (holding plaintiff waived legal malpractice claim when he did nothing until subject property became valuable); *Piluso v. Cohen,* 764 A.2d 549, 551 (Pa.Super.Ct.2000) (dismissing claim where plaintiff rejected settlement of case and waited until after unfavorable trial result to complain about lawyer). Thus, Plaintiffs effectively waived their claims against Defendants and are now equitably estopped from belatedly complaining of a conflict of interest. Summary judgment on that basis was therefore appropriate.

## CONCLUSION

¶ 59 Plaintiffs have not presented material disputed issues of fact to defeat Defendants' motion for summary judgment on their claims for breach of fiduciary duty. Similarly, Plaintiffs are barred by the legal doctrines of waiver and equitable estoppel. Under the undisputed facts, Defendants are entitled as a matter of law to summary judgment and dismissal of Plaintiffs' complaint. Accordingly, we affirm.

¶ 60 I CONCUR: JUDITH M. BILLINGS, Judge.

BENCH, Presiding Judge (dissenting):

¶ 61 Historically, in Utah and elsewhere, the majority of cases were decided by trial, not by summary judgment. *See Celebrity Club, Inc. v. Utah Liquor Control Comm'n,* 657 P.2d 1293, 1296 (Utah 1982) ("It has always been the policy of. our law to resolve doubts in favor of permitting parties to have their day in court on the merits of a controversy." (footnote and quotations omitted)); D. Theodore Rave, *Questioning the Efficiency of Summary Judgment,* 81 N.Y.U. L.Rev. 875, 877 (2006) ("Forms of summary judgment were available in several U.S. jurisdictions prior to the adoption of the Federal Rules in 1938, but the use of summary judgment was not widespread or consistent.").

¶ 62 The traditional rule is that summary judgment is available only where the moving party can affirmatively demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c); *see, e.g., Lamb v. B & B Amusements Corp.,* 869 P.2d 926, 928 (Utah 1993) ("As the moving party, [defendant] had the affirmative burden of establishing that there were no material issues of fact...."); *Amjacs Interwest, Inc. v. Design Assocs.,* 635 P.2d 53, 55 (Utah 1981) ("[A] party entitled to summary judgment must bear the burden of establishing the indisputability of the facts which warrant judgment in his favor." (citation and quotations omitted)). Further, in deciding a motion for summary judgment, the court is required to "view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Surety Underwriters v. E & C Trucking, Inc.,* 2000 UT 71, ¶ 15, 10 P.3d 338 (emphasis omitted).

¶ 63 Due to various factors, including the dramatic increase in the volume of cases, some courts began to make it easier for defendants, at least, to be awarded summary judgment. *See generally* Arthur R. Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Cliches Eroding Our Day in Court and Jury Trial Commitments?,* 78 N.Y.U. L.Rev. 982, 1018 (2003) (discussing reasons for growing prevalence of summary judgment). In 1986, the United States Supreme Court reevaluated the burdens for summary judgment and set forth the standard to be applied in federal courts. In *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court tied the movant's production burden for summary judgment to the burden of proof that party would bear at trial, holding that:

In our view, the plain language of Rule 56(c) mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Id.* at 322–23, 106 S.Ct. 2548 (citation omitted). Therefore, in the federal system, the burden of a defendant moving for summary judgment "may be discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548; *see also* Samuel Issacharoff & George Loewenstein, *Second Thoughts About Summary Judgment,* 100 Yale L.J. 73, 81–82 (1990) (noting that movant's burden is simply that of informing the court of the absence of key facts in dispute).

¶ 64 Some states, including Utah, have refused to adopt the burden-shifting approach of *Celotex. See, e.g., Harline v. Barker,* 912 P.2d 433, 445 n. 13 (Utah 1996) ("This court has not previously adopted the reasoning of the majority opinion in *Celotex,* which is not binding on us as a matter of law, and declines to do so today."); *Jarboe v. Landmark Cmty. Newspapers of Indiana, Inc.,* 644 N.E.2d 118, 123 (Ind.1994) ("Indiana does not adhere to *Celotex* and the federal methodology."). Unfortunately, language and reasoning from the *Celotex* line of cases have nevertheless crept into a few Utah cases, including those relied upon by the main opinion. *See, e.g., Waddoups v. Amalgamated Sugar Co.,* 2002 UT 69, ¶ 31, 54 P.3d 1054; *Andalex Res., Inc. v. Myers,* 871 P.2d 1041, 1046 (Utah Ct.App. 1994). But no Utah case has ever overruled the longstanding precedent for summary judgments in this jurisdiction.

¶ 65 In order to protect against the inadvertent overruling of precedent, Utah has adopted a very exacting standard for changing the common law. In *State v. Menzies,* 889 P.2d 393 (Utah 1994), the Utah Supreme Court stated that "[t]hose asking [the court] to overturn prior precedent have a substantial burden of persuasion. This burden is mandated by the doctrine of stare decisis." *Id.* at 398 (citation omitted). " 'This doctrine [of stare decisis], under which the first decision by a court on a particular question of law governs later decisions by the same court, is a cornerstone of the Anglo–American jurisprudence that is crucial to the predictability of the law and the fairness of adjudication.' " *Id.* at 399 (quoting *State v. Thurman,* 846 P.2d 1256, 1269 (Utah 1993)).

¶ 66 "The general American doctrine . . . is that a court . . . *will follow the rule of law which it has established in earlier cases, unless clearly convinced* that the rule was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent." *Id.* (emphasis added) (quotations and citation omitted). When departing from a long-standing precedent, "it is incumbent on [the court] to explain why [it is] overrul[ing] it." *Id.* Absent such an explanation, the traditional approach to summary judgment remains the controlling law in Utah. If Defendants cannot establish before trial that Plaintiffs' claims are unavailing as a matter of law, Plaintiffs are entitled to their day in court, which is where Plaintiffs' burden to prove their case is properly triggered.

¶ 67 Defendants, as the moving party here, have failed to carry their traditional burden. The main opinion does not even attempt to explain why Defendants are entitled to "judgment as a matter of law" on most of Plaintiffs' causes of action. Utah R. Civ. P. 56(c). Furthermore, after erroneously shifting the burden to the nonmoving party, the main opinion holds that for some causes of action the disputed facts are merely speculative or conjectural. I respectfully suggest that, in so holding, my colleagues have engaged in the process of weighing the evidence. In *W.M. Barnes Company v. Sohio Natural Resources Company,* 627 P.2d 56

(Utah 1981), the Utah Supreme Court succinctly stated as follows:

> On a motion for summary judgment, it is not appropriate for a court to weigh disputed evidence . . .; the sole inquiry to be determined is whether there is a material issue of fact to be decided. In making that determination, a court should not evaluate the credibility of the witness. It is of no moment that the evidence on one side may appear to be strong or even compelling. . . .

*Id.* at 59 (citation omitted).

¶ 68 In sum, Defendants have failed to demonstrate that there are no disputed material issues of fact and that they are entitled to judgment as a matter of law. I would therefore reverse the summary judgment and remand the case for trial.

Mineral and Surface Ownership
Before November 1999