**C.W. FINK, Plaintiff and Appellant,**

v.

**Jim MILLER and Shannon Miller, Defendants and Appellees.**

No. 940267–CA.

Court of Appeals of Utah.

May 25, 1995.

David J. Bird, Richards, Bird & Kump, P.C., Salt Lake City, for appellant.

Thomas F. Rogan, Salt Lake City, for appellees.

Before ORME, P.J., and DAVIS, Associate P.J., and JACKSON, J.

## OPINION

ORME, Presiding Judge:

Plaintiff appeals the trial court's order declaring a subdivision's restrictive covenant requiring wood shingle roofing to be unenforceable. Having concluded that "[t]he facts and legal arguments are adequately presented in the briefs and record and the decisional process would not be significantly aided by oral argument," Utah R.App.P. 29(a)(3), we affirm.

## FACTS

Plaintiff C.W. Fink and defendant Shannon Miller purchased lots in Maple Hills Subdivision No. 3, Plat D, located in the east bench

area of Bountiful, Utah. Both parties received copies of the Agreement for Protective Covenants, recorded in Davis County by the developer of Maple Hills in 1978.[1] One of the covenants recites that "[w]ood shingles ... shall be required on the exterior roofs of all structures." Also, prospective home builders, as well as owners intending to improve or alter existing structures, must submit all plans and specifications, including proposed exterior colors and materials, to the Community Development Committee[2] for its approval before commencing construction.

Sometime prior to 1985, Committee members received a copy of the Agreement with a handwritten addition to the roofing materials provision, so that the restriction read "wood shingles or bar tile." Consequently, prior to 1985 the Committee approved plans calling for tile roofs. In 1985 it learned that the covenant had not, in fact, been thus amended. Meanwhile, six homes were built with fiberglass/asphalt shingle roofs without Committee approval. By the end of 1985, twenty-nine homes had been completed in Maple Hills. Eight homes had wood shingle roofs, while twenty-one homes had either tile or fiberglass/asphalt shingle roofs.

Nevertheless, subsequent to 1985, the Committee has sought to enforce the covenant restricting roofing materials to wood shingles and has refused to approve plans that included tile or fiberglass/asphalt shingle roofs. In 1990, the Committee approved plans submitted by defendants Shannon Miller and her husband, Jim Miller, which called for a wood shingle roof. One year later, the Millers requested approval to change the originally specified roofing material from wood shingles to fiberglass shingles. After the Committee denied the change, the Millers nonetheless commenced installation of fiberglass shingles.[3]

In November 1991, Fink commenced this action and filed an *ex parte* motion seeking injunctive relief to prevent the installation of fiberglass shingles on the Millers' home. In response to his motion, the trial court issued a temporary restraining order and soon held a hearing regarding a preliminary injunction. Late in 1991, the court granted a preliminary injunction enjoining the Millers from install-

---

1. The Agreement includes the following provisions, with our emphasis:

 [I]t is the desire of said owner and intent thereof that the said property shall be conveyed hereafter subject to the restrictive covenants set forth below in order to enhance a more uniform development of the lots therein, maintain to the extent possible the natural environment in which they are located, and to maintain the value thereof.

 . . . .

 2. ARCHITECTURAL CONTROL
 No building or structure shall be erected, placed, or altered on any lot in Maple Hills Subdivision No. 3 until the construction plans thereof, specifications and the plot plan showing the locations of such structures have been approved in writing by the Community Development Committee. Such approval will concern itself with the acceptability and harmony of external design of the proposed structure to the locale and as to the location of the proposed structure with respect to topography and grade, quality of materials, size, height, color, etc. No structure shall be built upon any lot with a height exceeding two stories above the existing ground elevations unless approved by the Community Development Committee. Buildings shall be designed to preserve the natural beauty of the area. Only those exterior materials which will blend harmoniously into the natural environment, with special emphasis on earth-toned colors, shall be permitted.

 *Wood shingles,* with fire retard[a]nt underlayment, *shall be required on the exterior roofs of all structures.* Masonry (brick and stone) exterior [is] strongly encouraged. Exterior television antennae [are] prohibited. Exposed metal flues, vents, ventilators or other metallic rooftop protuberances shall be coated or painted with a neutral color which will blend harmoniously with the wood shingles. The Community Development Committee shall have final control for approval of color and material plans.

 . . . .

 10. ECOLOGICAL CONSIDERATIONS
 Only such foliage shall be removed from each lot as is necessary for clearing the driveway, excavation for the foundation, and for law[n]s and patio areas. In general, the lawn and patio area shall not exceed in area the square foot area of the main level of the house erected on the lot. Deviations from this standard will be allowed by the Community Development Committee after appropriate review. Owners are encouraged to plant tree[s] and shrubs to enhance the natural beauty, provide windbreaks and improve erosion control.

2. Fink has been a member of the Committee since 1985.

3. In 1993, the Millers again requested approval for fiberglass or aluminum lock shingles, but the Committee denied this request as well.

ing any roofing material other than wood shingles. The court concluded there had "been no general waiver or abandonment of the Covenants."

Fink filed a motion for summary judgment and permanent injunction in July 1993, and the Millers filed their own motion for summary judgment in August 1993. After a hearing in September, the trial court considered the parties' written submissions, personally observed the subdivision, and then issued a minute entry on October 7, 1993. The court held that the covenant restricting roofing materials to only wood shingles is unenforceable. However, it continued the preliminary injunction in effect pending the parties' submission of memoranda on the issue of "irreparable harm."

Another hearing was held November 8, 1993. On February 2, 1994, the trial court issued its final order, quashing all prior injunctive relief and denying a permanent injunction. The court, noting in its factual findings that as of July 1993 the subdivision's eighty-one completed homes included fifty-eight homes with wood shingle roofs and twenty-three homes with non-wood roofs, concluded that the covenants still validly restricted the color and quality of materials, but could not restrict roofing materials by type. The court opined that the Committee must approve any roofing materials of adequate quality that blend "harmoniously with the current neighborhood." Fink now appeals from this order.

## ISSUES

Fink's arguments focus on two issues: (1) whether the trial court erred in concluding, as a matter of law, that the covenant restricting roofing materials to wood shingles cannot be enforced and (2) whether there existed disputed material facts which should have precluded the court's grant of summary judgment in favor of the Millers.

## STANDARD OF REVIEW

■ Summary judgment is appropriate only if there is no genuine issue of material fact and, given the facts, the moving party is entitled to judgment as a matter of law.

Utah R.Civ.P. 56(c); *Higgins v. Salt Lake County*, 855 P.2d 231, 235 (Utah 1993). We review the trial court's decision to grant summary judgment for correctness, viewing "the facts in the light most favorable to the losing party." *Green v. Stansfield*, 886 P.2d 117, 119 (Utah App.1994). We also review the trial court's determinations of law for correctness. *State v. Pena*, 869 P.2d 932, 936 (Utah 1994).

## ENFORCEABILITY OF THE COVENANT

■ As a general proposition, property owners who have purchased land in a subdivision, subject to a recorded set of restrictive covenants and conditions, have the right to enforce such restrictions through equitable relief against property owners who do not comply with the stated restrictions. *See Crimmins v. Simonds*, 636 P.2d 478, 480 (Utah 1981) (noting property owners' protectable interest in enforceability of covenants). *See generally* Roger A. Cunningham et al., *The Law of Property* §§ 8.32, 8.33 (1984). However, as explained below, property owners may lose this right if the specific covenant they seek to enforce has been abandoned, thereby rendering the covenant unenforceable.

### 1. Applicable law

In the instant case, the trial court, as well as the parties, relied upon *Crimmins v. Simonds*, 636 P.2d 478 (Utah 1981), in analyzing the enforceability of the covenant restricting roofing materials. In *Crimmins*, the Utah Supreme Court examined a restriction forbidding the operation of a trade or business within a subdivision and held that a restrictive covenant is unenforceable if a change in circumstances in the neighborhood is "so great that it clearly neutralizes the benefits of the restriction to the point of defeating its purpose, or … renders the covenant valueless." *Id.* at 479. This analysis is useful in the context of restrictions that are closely related to the use of the affected property, such as a covenant that forbids commercial operations or limits land use to agricultural activities. Repeated violations of such covenants may directly affect the nature

and character of a particular area or neighborhood, thereby producing a discernible change in circumstances. The Court in *Crimmins* determined that most of the property owners operating existing businesses in the subdivision did so out of their homes, i.e., they were residents whose business activities were secondary to their residential activities. *Id.* at 480. Accordingly, the predominantly residential character of the neighborhood had not changed so dramatically as to render the prohibition on commercial activities valueless. *Id.*

■ However, unlike the covenant at issue in *Crimmins*, the covenant in the instant case restricts not the use of the property itself, but merely the selection of certain building materials for aesthetic purposes. Violations of this sort of covenant would not produce obvious changes in the fundamental nature of the Maple Hills subdivision—its upscale residential character remains unchanged.[4] Instead, a more appropriate test to determine abandonment of such a covenant requires the party opposing enforcement to prove that existing "violations are so great as to lead the mind of the average [person] to reasonably conclude that the restriction in question has been abandoned." *Tanglewood Homes Ass'n v. Henke*, 728 S.W.2d 39, 43 (Tex.App.1987). In simplest terms, this test is met when the average person, upon inspection of a subdivision and knowing of a certain restriction, will readily observe sufficient violations so that he or she will logically infer that the property owners neither adhere to nor enforce the restriction.

In applying this test, courts consider the " 'number, nature, and severity of the then existing violation[s], any prior acts of enforcement of the restriction, and whether it is still possible to realize to a substantial degree the benefits intended through the covenant.' " *Id.* at 43–44 (quoting *New Jerusa-*

*lem Baptist Church, Inc. v. City of Houston*, 598 S.W.2d 666, 669 (Tex.App.1980)). *See also Lakeshore Property Owners Ass'n v. Delatte*, 579 So.2d 1039, 1043 (La.App.) ("abandonment of a restriction depends upon the character, materiality and number of violations and their proximity to the objecting residents"), *cert. denied*, 586 So.2d 560 (La. 1991); *Tompkins v. Buttrum Constr. Co.*, 99 Nev. 142, 659 P.2d 865, 867 (1983) (abandonment of restriction will be found if "general and substantial violations" existed).

■ To maximize the benefits of the essentially objective quality of this test, courts applying it should first analyze violations as to their number, nature, and severity. If these elements alone are sufficient to lead the average person to believe the covenant has been abandoned, it is not necessary to go further. However, if abandonment is still in doubt, courts should then consider the other two factors—namely, prior enforcement efforts and possible realization of benefits—to resolve the abandonment question.

### 2. Analysis

We now consider whether, employing the above test, the existing violations of the Maple Hills roofing covenant demonstrate that it has been abandoned.

#### A. Number, nature, and severity of violation

■ We may readily ascertain the actual "number, nature, and severity" of violations of the roofing materials covenant by merely looking at the undisputed facts. Twenty-three out of eighty-one houses in Maple Hills have roofs which do not conform to the wood shingle restriction. A plain reading of the covenant shows that permitted exterior roofing materials are limited to wood shingles only. *See Gosnay v. Big Sky Owners Ass'n*, 205 Mont. 221, 666 P.2d 1247, 1250 (1983)

---

4. Utilization of the *Crimmins* test put the trial court in the awkward position of determining whether the visual qualities of the nonconforming roofs caused a change in aesthetic circumstances. The court, after viewing the subdivision, noted that "those that had the worst appearance as far as the aesthetics, were the wood shingle shake roofs because of all the bleaching and the different colors." Joining the debate at

this level, Fink implied that the trial court could not have made an accurate observation of the roofs of Maple Hills because they were wet from a rainstorm during the court's tour, and thus the differences were not as apparent as they would have been during drier conditions.

The essentially objective test which we adopt obviates the need for courts to make such subjective judgments.

(interpreting covenants according to plain language contained therein). Fink incorrectly attempts to characterize the houses with tile roofs that were erroneously approved by the Committee as somehow less in violation of the covenant than the houses with fiberglass/asphalt shingles that were not approved by the Committee. The circumstances under which property owners obtained approval for tile roofing materials cannot mask the simple fact that there are twenty-three houses, a substantial number of the total houses in the subdivision, *not conforming* with the restrictive covenant.[5]

Accordingly, violations of the wood shingle restrictive covenant are sufficiently widespread that it must be concluded, as a matter of law, that the restriction has been abandoned and is unenforceable.

### B. Other factors: enforcement and benefits

Because objective analysis of the number and nature of the violations demonstrates the covenant has been abandoned, we need not extend our inquiry to the remaining factors discussed above. We briefly touch upon them only to aid future judicial application of the test adopted in this opinion.

First, the property owners' overall record of enforcement of the covenant is problematic. While there has been a fairly consistent pattern of enforcement since 1985, there was little or no enforcement between 1978 and 1985. Indeed, by 1985 only eight of the twenty-nine existing houses conformed with the wood shingle requirement. Fink attempts to minimize this fact by claiming the Committee inadvertently used a copy of the Agreement that appeared to allow houses with tile roofs. As we see it, however, the Committee's unquestioning reliance on a handwritten note of unknown origin only underscores the laxity of the Committee's enforcement approach during the 1978–85 period.

Next, we consider whether, notwithstanding the existing violations, it is possible to realize the benefits intended by the covenant. In so doing, we read the entire Agreement as a whole, and do not read a single covenant in isolation, in order to determine the intent of the restriction at issue. *Gosnay*, 666 P.2d at 1250. The Agreement plainly states its purposes: to maintain the natural environment; to promote uniform development; and to maintain property values. *See supra* note 1. Given the significant number of houses with nonconforming roofing materials in Maple Hills, uniformity of development—at least with respect to that particular design element—cannot be accomplished by belated enforcement of the covenant. However, property owners can still enforce other restrictions related to architectural design,[6] such as the provision requiring approv-

---

**5.** Because the covenant mandates use of a specific roofing material, wood shingles, we need not address the severity of each individual violation—a structure either has the required type of roof or it does not. Other restrictions may not be so clear-cut. For example, in the case of a covenant that mandates certain set back distances, a de minimis violation of a few inches may be accorded less significance than a flagrant violation of ten feet. *See Tanglewood Homes Ass'n v. Henke*, 728 S.W.2d 39, 43 (Tex.App. 1987).

**6.** The trial court made three conclusions of law:
1. Although the Covenants are still enforceable with regard to the color and quality of roofing materials so as to blend harmoniously into the natural environment, they are no longer enforceable as to material, provided the color and quality of the material is such that it blends harmoniously with the character and environment of the subdivision.
2. The protective covenant restricting roofing materials is not binding except with regard to color and quality.

3. The Community Development Committee may approve defendants' plans for roofing material as to color and quality if it blends harmoniously with the current neighborhood environment, but the Community Development Committee may not reject tile or high density fiberglass/asphalt [shingles] as long as color and quality standards are met to blend harmoniously with the current neighborhood environment.

While the first two conclusions are beyond reproach, we agree with Fink's contention that the trial court incorrectly instructed the *Committee* as to what action it must take regarding the Millers' plans and how it must apply the covenants. The Committee was never a party to this proceeding, and the trial court exceeded the bounds of its authority by directing the actions of a nonparty. Therefore, we vacate the court's third conclusion of law insofar as it purports to direct or limit the actions of the Committee.

al of color and quality of materials, with colors limited to earth tones.[7] Abandonment of one covenant does not suggest abandonment of other, albeit similar, covenants in the agreement. *See Tompkins v. Buttrum Constr. Co.*, 99 Nev. 142, 659 P.2d 865, 867 (1983) (violations of other covenants have no effect on covenant at issue).

## SUMMARY JUDGMENT

 Fink contends that the affidavits submitted to the trial court present conflicting issues of material fact which the court "weighed" in reaching its findings on diminution of value and the Committee's approval of, or acquiescence in, plans calling for tile or fiberglass/asphalt shingle roofs. While there were conflicting facts among the profusion of affidavits presented by both parties, none of the disputed facts were *material,* so as to preclude summary judgment. Given our conclusion of unenforceability due to abandonment of the covenant, it does not matter whether the tile or fiberglass/asphalt shingle roofs were approved, approved in error, or disapproved by the Committee or other property owners. The single pivotal fact, which is not disputed by either party, is that twenty-three of eighty-one houses have roofs not in compliance with the covenant limiting roofing materials to wood shingles. As a matter of law, the twenty-three violations demonstrate abandonment of the wood shingle requirement, thereby rendering that part of the covenant unenforceable. Therefore, we affirm the trial court's grant of summary judgment in favor of the Millers.[8]

## CONCLUSION

We affirm the trial court's order denying permanent injunctive relief to Fink and granting summary judgment to the Millers.

DAVIS, Associate P.J., and JACKSON, J., concur.

---

7. Thus, property owners may still benefit from the stated purposes of the Agreement by enforcing other covenants that have the effect of restricting building materials and styles to those that harmonize with the environment, maintain the overall value of the homes in the subdivision, and promote uniform development. Of course, an architectural committee's decisions made in the course of the approval or denial of prospective house plans and specifications "must be reasonable and made in good faith and must not be arbitrary or capricious." *Rhue v. Cheyenne Homes, Inc.*, 168 Colo. 6, 449 P.2d 361, 363 (1969) (en banc). *See Smith v. Butler Mountain Estates Property Owners Ass'n*, 367 S.E.2d 401, 407 (1988), *aff'd*, 324 N.C. 80, 375 S.E.2d 905 (1989).

8. The trial court's decision relied, in part, upon a particular version of the Committee's actions, despite the parties' factual disagreement. The trial court also applied the *Crimmins* change-in-circumstances test, which we hold to be inapplicable to cases like the instant one. However, we may affirm the trial court on any appropriate basis. *Bailey–Allen Co. v. Kurzet*, 876 P.2d 421, 425 (Utah App.1994). *See K & T, Inc. v. Koroulis*, 888 P.2d 623, 628 (Utah 1994) ("[W]e may affirm a grant of summary judgment on any ground, even one not relied upon by the trial court.").

We also note that the trial court showed undue concern about the issue of "irreparable harm." While the element of harm must be met when considering the necessity for a temporary restraining order, *see* Utah R.Civ.P. 65A(b)(1), it is not essential to the court's decision to grant a permanent injunction to enforce a restrictive covenant. Property owners have a protectable interest in enforcing restrictive covenants through injunctive relief without a showing of harm. *See Crimmins v. Simonds*, 636 P.2d 478, 480 (Utah 1981); *Hagemann v. Worth*, 56 Wash. App. 85, 782 P.2d 1072, 1074 (1989); *Morris v. Kadrmas*, 812 P.2d 549, 554 (Wyo.1991).