**2019 UT App 140**

## THE UTAH COURT OF APPEALS

ROBERT VANDERWOOD AND LORRAINE VANDERWOOD,
Appellees,
*v.*
KENNETH D. WOODWARD,
Appellant.

Opinion
No. 20180503-CA
Filed August 22, 2019

Second District Court, Ogden Department
The Honorable Mark R. DeCaria
No. 160904934

Brad C. Smith, Attorney for Appellant

Jason M. Yancey, Richard W. Jones, and Taylor R.
Jones, Attorneys for Appellees

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and DIANA HAGEN concurred.

HARRIS, Judge:

¶1     Kenneth D. Woodward built a large detached garage
(Garage) behind his house. This infuriated his next-door
neighbors, Robert and Lorraine Vanderwood (the
Vanderwoods), who consider the structure an eyesore and not in
keeping with the subdivision's restrictive covenants, known as
the Declaration of Building and Use Restrictions (Restrictions).
The Vanderwoods sued Woodward, seeking (among other
things) a judicial order commanding Woodward to tear down
the Garage. After entertaining cross-motions for summary
judgment, the district court declared the Garage out of
compliance with the Restrictions, and ordered Woodward to tear
it down. Woodward now appeals, and we reverse.

BACKGROUND[1]

¶2     The parties own adjacent homes in the Country Haven Subdivision No. 3 (Subdivision) in Weber County, Utah, with the Vanderwoods living immediately to the north of Woodward. Each lot in the Subdivision is subject to the Restrictions, which the Subdivision's original developer duly recorded in May 2003, before any of the parties purchased property within the Subdivision. Among other things, the Restrictions contain a number of covenants that control not only the type of structures that can be built within the Subdivision, but also control, to some extent, the type of material that can be used to build them and where they may be built. The Restrictions also require that all construction plans be approved by an "Architectural Control Committee" (ACC), which was to be established and operated pursuant to the Restrictions.

¶3     The original developer named members of the original ACC, but these individuals did not actually function as an ACC, and never provided any approvals or disapprovals of designs or plans for any structures within the Subdivision. The developer transferred all of the lots to new owners by 2003 or 2004, and since then the Subdivision's homeowners have had the right to reform the ACC and make it functional, but they never have. There are twenty-three lots in the Subdivision, all of which are built out, and no proposed building or structure has ever been reviewed, let alone approved or disapproved, by an ACC. Indeed, prior to the instant suit, not only had both Woodward and the Vanderwoods built houses on their respective properties without seeking the approval of any ACC, but both had also

_____

1. "When reviewing a district court's grant or denial of a motion for summary judgment, we view the facts in a light most favorable to the party opposing the motion." *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 31, 116 P.3d 323 (quotation simplified).

constructed some type of outbuilding (Woodward had built a shed; the Vanderwoods a detached garage) on their properties without bothering to obtain ACC approval. The other residents of the Subdivision acted similarly; all have built something on their property without obtaining approval from anyone, and the record does not contain evidence of any objection—prior to the events giving rise to this lawsuit—by any homeowner to any other homeowner's proposed construction, whether on the basis of lack of ACC approval or for any other reason.

¶4 In May 2016, Woodward hired a local construction company (Builder) to construct a "pole garage" on his lot that he could use as a workshop to restore automobiles and build hot-rods. A few weeks later, Woodward applied for a building permit from West Haven City for the project. As part of the permitting process, a city building inspector (Inspector) visited Woodward's lot and reviewed the plans and the proposed placement. Inspector and Woodward also discussed the Restrictions, and Inspector explained that, because "there had never been an [ACC] functioning in [the Subdivision]," it was "not only impossible, but unnecessary for [Woodward] to receive approval" from the ACC. After meeting with Woodward and reviewing the plans, Inspector issued Woodward a building permit for the Garage, and construction commenced.

¶5 In August 2016, while the Garage was still under construction, the Vanderwoods approached Woodward and provided him a letter objecting to the construction of the Garage, and stating their belief that the building materials being used—metal siding for the exterior walls and a metal roof—were in violation of the Restrictions. Specifically, they asserted that both houses and outbuildings must "match in materials," and that "[b]rick, stone or stucco" must be used for the exterior walls of the structure, and "[c]edar [s]hake, [t]ile, or [a]rchitectural shingles" must be used for the roof. The letter voiced no objection to the Garage's location or placement. In response,

Woodward invited the Vanderwoods to meet with Builder "to address any aesthetic concerns," but the parties were unable to come up with a mutually satisfactory solution. Thereafter, and with only the Garage's roof left to be installed, the Vanderwoods filed this lawsuit.

¶6     In their complaint, the Vanderwoods made several specific claims that Woodward's Garage was in violation of the Restrictions. First, they alleged that the Garage was out of compliance because Woodward had not first obtained ACC approval for the construction. Second, they complained that the Garage was "not in harmony" with other buildings in the Subdivision. Third, they asserted that the Garage was constructed with materials not allowed by the Restrictions. And finally, they claimed that the Garage was located in a position that violated the Restrictions' setback requirements.

¶7     Following discovery, the Vanderwoods filed a motion for partial summary judgment with regard to liability, seeking an order declaring that the Restrictions constitute a valid and enforceable contract and that, by building the Garage, Woodward had violated the terms of that contract. Woodward responded by filing a summary judgment motion of his own, asking the court to declare that the Subdivision homeowners had abandoned the Restrictions and that he had therefore not violated them. Both sides also sought attorney fees.

¶8     Both sides filed sworn declarations in support of their motions for partial summary judgment. Attached to the Vanderwoods' first declaration are a number of photographs depicting outbuildings in the Subdivision that appear to be in violation of the side and rear yard setback requirements. Woodward noted this in his responsive declaration, stating that the "side and rear setback requirements have been routinely disregarded in [the S]ubdivision," and specifically noting seven homeowners who he thought had done so. In a rebuttal

declaration, the Vanderwoods acknowledged that "there are a handful of" homeowners in the Subdivision who "have violated the side yard setback requirements."

¶9 After briefing and oral argument, the district court granted the Vanderwoods' motion and denied Woodward's. In so ruling, the court concluded, among other things, that (1) "the requirement that all buildings get ACC approval has been abandoned," but that the remainder of the Restrictions had not been abandoned and were enforceable; (2) the Garage's metal roof and metal exterior violates the Restrictions; and (3) the Garage's location violates "the side-yard setback provision" of the Restrictions.

¶10 Soon thereafter, the Vanderwoods filed a second motion for summary judgment, this time asking the district court to impose a remedy. Specifically, they asked the court to enforce the Restrictions by ordering that the Garage "be immediately disassembled and moved to comply with the setback requirements" and, if rebuilt, to comply with the Restrictions' roofing and exterior material requirements. Woodward opposed the motion, arguing that injunctive relief was improper. The court again granted the Vanderwoods' motion, and issued the requested injunction.[2] Pursuant to the terms of the Restrictions, the court also ordered Woodward to pay the Vanderwoods their attorney fees they had accrued in bringing the lawsuit.

_____

2. The record contains no indication that the district court's injunction was ever stayed pending this appeal. However, neither side has suggested that the case has become moot by virtue of the Garage having been disassembled and rebuilt, and therefore we presume that the district court's order has not yet been carried out.

ISSUES AND STANDARDS OF REVIEW

¶11 Woodward now appeals, and asks us to consider five issues. The first three issues consist of challenges to the district court's first grant of summary judgment. First, Woodward contends that the Restrictions have been abandoned in their entirety and are therefore unenforceable. Second, Woodward contends that the provisions in the Restrictions regulating building materials apply only to dwellings, and that therefore the Restrictions do not forbid the construction of a metal outbuilding. Third, Woodward contends that the Vanderwoods have failed to adequately establish that the Garage is in violation of the setback Restrictions. Summary judgment is proper when "the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). "When reviewing a district court's denial of summary judgment, we grant no deference to the district court's legal conclusions and review them for correctness." *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 19, 116 P.3d 323 (quotation simplified).

¶12 Fourth, Woodward contends that the district court's grant of injunctive relief in favor of the Vanderwoods was improper. "On appellate review, a grant of injunction is overturned only upon showing that the district court abused its discretion or that the decision is clearly against the weight of evidence." *Carrier v. Lindquist*, 2001 UT 105, ¶ 26, 37 P.3d 1112.

¶13 Fifth, Woodward challenges the district court's award of attorney fees to the Vanderwoods as the prevailing party. "Whether a party is the prevailing party in an action is a decision left to the sound discretion of the trial court and reviewed for an abuse of discretion." *Larry J. Coet Chevrolet v. Labrum*, 2008 UT App 69, ¶ 16, 180 P.3d 765 (quotation simplified).

ANALYSIS

I. The Restrictions

¶14　Woodward first contends that the district court erroneously entered summary judgment in favor of the Vanderwoods on their claim that Woodward breached the terms of the Restrictions. This is a claim for breach of a contract. *See Swenson v. Erickson*, 2000 UT 16, ¶ 11, 998 P.2d 807 (stating that "interpretation of [restrictive] covenants is governed by the same rules of construction as those used to interpret contracts"). A breach of contract claim has four elements: "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *America West Bank Members, LC v. State*, 2014 UT 49, ¶ 15, 342 P.3d 224 (quotation simplified). Woodward offers three reasons why he believes the Vanderwoods' breach of contract claim fails, either in whole or in part. First, he asserts that the Restrictions—most notably the requirement that all construction projects be reviewed and approved by an ACC—have been abandoned, and that neither he nor any other homeowner in the Subdivision remains bound by them. Second, he contends that the Restrictions' provision governing building materials applies only to dwellings, and not to his detached Garage. Third, he claims that the Vanderwoods have not provided sufficient evidence in support of their claim that the Garage violated the Restrictions' setback requirements.

A.　Abandonment of the ACC Procedures

¶15　Woodward first argues that the Restrictions' advance-ACC-approval requirement (Part B.2), including its provision requiring external "harmony" between structures, has been abandoned. In his briefs, he further asserts that the abandonment of this covenant renders the Restrictions as a whole unenforceable. In response, the Vanderwoods contend that, even if "the requirement to obtain prior approval from the

ACC has been abandoned or waived," that provision can be severed from the Restrictions without invalidating the Restrictions in their entirety. While we agree with Woodward that Part B.2 has been abandoned, abandonment must be analyzed on a provision-by-provision basis, and the Subdivision's collective abandonment of the ACC provisions does not mean that the Restrictions have been abandoned in their entirety.

¶16    Property owners who purchase land subject to restrictive covenants "have a right to enforce such covenants against other owners who violate them." *Swenson*, 2000 UT 16, ¶ 21. However, "property owners may lose this right if the specific covenant they seek to enforce has been abandoned." *Fink v. Miller*, 896 P.2d 649, 652 (Utah Ct. App. 1995). Abandonment of a covenant occurs when there is "substantial and general noncompliance with the covenant." *Swenson*, 2000 UT 16, ¶ 22 (quotation simplified). Conversely, abandonment has not occurred if the violations "are slight, unimportant, and unsubstantial," "are of a minor nature and do not destroy the general building scheme," or are "inoffensive." *Id.* ¶ 23 (quotation simplified). Simply put, abandonment has occurred "when the average person, upon inspection of a subdivision and knowing of a certain restriction, will readily observe sufficient violations so that he or she will logically infer that the property owners neither adhere to nor enforce the restriction." *Fink*, 896 P.2d at 653.

¶17    Our supreme court has adopted a three-part test for determining whether a specific covenant has been abandoned. Under this test, courts "examine: (1) the number, nature and severity of the then existing violations; (2) any prior act of enforcement of the restriction; and (3) whether it is still possible to realize to a substantial degree the benefits intended through the covenant." *Swenson*, 2000 UT 16, ¶ 27 (quotation simplified). Furthermore, "[a]bandonment of one covenant does not suggest abandonment of other, albeit similar, covenants in the

agreement," *Fink*, 896 P.2d at 655, and "[e]vidence of abandonment must be established by clear and convincing evidence," *Swenson*, 2000 UT 16, ¶ 22.

¶18    One of the covenants at issue here is the provision requiring that all construction within the subdivision be approved in advance by an ACC. Part B.2 of the Restrictions provides in relevant part as follows:

> No building, structure or wall shall be erected, placed or altered on any lot until the construction plans and specifications and a plan showing the location of the structure have been approved by the [ACC] as to quality of workmanship and materials, harmony of external with existing structures, and as to location with respect to placement on lot, topography and finish grade elevation.

¶19    After reviewing the evidence submitted to it on summary judgment, including the undisputed facts that no ACC had ever functioned in the Subdivision, and that no homeowner in the Subdivision had ever obtained approval for any construction from any ACC, the district court determined that "the requirement that all buildings get ACC approval has been abandoned," and no party challenges that determination on appeal. We therefore credit the district court's determination in this regard, and consider the ACC-approval requirement to have been abandoned.

¶20    The Vanderwoods argue, however, that abandonment of the ACC-approval requirement does not necessarily mean that all of Part B.2 must fall. Specifically, they argue that Part B.2's language mandating that the ACC review proposed construction projects for, among other things, "harmony of external" constitutes a substantive requirement that buildings within the

Subdivision be in harmony with each other.[3] We simply disagree. The provision is entirely procedural—it requires that any construction project within the Subdivision be submitted to the ACC for advance approval, and it sets forth certain things the ACC should look for in conducting its review, including "harmony of external." If there is no requirement that any homeowner submit construction projects to an ACC, then the criteria that any such ACC would use to evaluate such projects become irrelevant. In sum, we consider "harmony of external" to have been among the criteria a functioning ACC could have used to evaluate proposed construction projects, and if there is no functioning ACC, then there is no body to review projects for any such criteria. Given that Part B.2 is entirely procedural, it loses all relevance and functionality once the ACC-approval requirement has been abandoned. We therefore consider the entire ACC preapproval process—including its attendant procedures set forth in Part B.2—abandoned in its entirety.[4]

¶21    However, the abandonment of Part B.2, even in its entirety, does not necessarily operate to invalidate the Restrictions as a whole. As Woodward's counsel acknowledged during oral argument before this court, a finding of

---

3. Woodward argues that the provision ("harmony of external") is a nonsensical sentence fragment that in any event is too vague and arbitrary to enforce as a substantive provision. We need not consider these arguments, in light of our conclusion that the entirety of Part B.2 has been abandoned.

4. Other provisions exclusively dealing with the ACC-approval requirement must also be considered abandoned, including Part B.3(e), which requires that "[a]ll exterior materials must be approved" by the ACC prior to construction.

abandonment must be made on a provision-by-provision basis. *See Fink*, 896 P.2d at 655 (stating that "[a]bandonment of one covenant does not suggest abandonment of other, albeit similar, covenants in the agreement"). Thus, a determination that one provision is unenforceable does not require a determination that all of the provisions are unenforceable; claims of abandonment must be analyzed on a provision-by-provision basis. Moreover, the Restrictions contain a severability clause, which provides that each provision is "independent of and severable from the rest," and that if any of its provisions "shall be held to be invalid or . . . unenforceable . . . that holding shall [be] without effect upon the validity [or] enforceability" of the other provisions.

¶22    In sum, Part B.2 has been abandoned, in its entirety, including the "harmony with external" provision, and is unenforceable against Woodward. Therefore, Woodward was not required to obtain advance approval from a non-existent ACC before he began building his Garage. But this covenant is severable from the remaining Restrictions, and its abandonment does not necessarily affect the enforceability of the other Restrictions.[5]

B.    Building Materials Covenant

¶23    Woodward next argues that the provisions in the Restrictions that regulate building materials (Part B.3) apply only to dwellings, and are therefore inapplicable in this case because the Garage is not a dwelling. In support of this argument, Woodward looks to the structure and text of Part B.3

---

5. In addition to asserting that the ACC-approval provisions have been abandoned, Woodward claims that the Restrictions' setback requirements have likewise been abandoned, and we discuss that specific claim below, *see infra* section I.C.2.

itself, and specifically points to the title of Part B.3—"Dwelling Cost, Quality and Size"—to show that the restrictions within this provision are all related to "dwellings." Conversely, the Vanderwoods contend that Woodward's reliance on the structure of the paragraph is misguided, and that paragraph headings are not technically part of the contract and do not control its interpretation. They instead argue for a broader application of Part B.3, and contend that it applies to all structures constructed within the Subdivision, and not just to dwellings. In order to address the parties' arguments, we find it necessary to set forth Part B.3 in its entirety:

> 3.  <u>Dwelling Cost, Quality and Size.</u> No Dwelling shall be permitted on any lot at a cost of less than $150,000, exclusive of lot and financing, based upon cost levels prevailing on the date . . . these covenants are recorded, it being the intention and purpose of the covenants to assure that all dwellings shall be of a quality of workmanship and materials substantially the same or better than that which can be produced on the date these covenants are recorded at the minimum cost stated herein for the minimum permitted dwelling size. The minimum permitted dwelling size shall be as follows:
>
> (a) The ground floor square feet area of the main structure, exclusive of garage and any one-story open porches, shall not be less than 1,700 square feet for a one-story dwelling.
>
> (b) In a two-story home, which is two stories above curb level, the combined area of the ground story level and the story above ground-story level, exclusive of garage and any one-story open porches, shall total not less than 2,200 square feet.

(c) In a multi-level home (i.e. three or four level split), the total area of all levels of the main structure above ground, exclusive of garage and any one story open porches, shall not be less than 2,200 square feet. For purposes of this paragraph, only finished area in levels, the entirety of which are more than ½ exposed above finished grade, shall be included in the calculation of area.

(d) All dwellings shall be set on permanent foundations. All houses shall have an attached garage large enough to accommodate at least two automobiles. All houses shall be finished with brick, stucco or stone on all parts of the house exterior. Foundations or basement cement must not exceed three feet of exposure out of the ground line, unless the appropriate finish materials as described above are used for the facade. All houses shall have a roof with a minimum 6/12 pitches.

(e) All exterior materials must be approved by the [ACC] prior to commencement of construction.

(f) Aluminum or vinyl siding shall be allowed in soffit and facia areas, and in other areas approved by the [ACC].

(g) Roofing materials shall be cedar shake, tile, or architectural grade asphalt shingles (20+ year type) or as approved by the [ACC].

(h) Sewer system connections and fees shall be the responsibility of buyer. Connections and connection specifications shall be as determined by the Health Department of the State of Utah or other applicable governing bodies. All plumbing fixtures, dishwashers and toilets shall be connected

to the individual sewer system connection, which shall, in turn be connected to the main sewer line provided by developer.

¶24    Under the traditional rules of contract interpretation,[6] a court's underlying purpose is to "determin[e] what the parties intended by the contractual language." *Utah Transit Auth. v. Greyhound Lines, Inc.*, 2015 UT 53, ¶ 31, 355 P.3d 947; *see also WebBank v. American Gen. Annuity Service Corp.*, 2002 UT 88, ¶ 17,

_____

6. Woodward, citing case law from other jurisdictions, argues persuasively that the Restrictions should be strictly construed in favor of free and unrestricted use of property, especially given that restrictive covenants are usually unilaterally imposed by a developer prior to the homeowner's involvement, and therefore usually afford homeowners no opportunity to negotiate particular language or provisions. *See, e.g.*, *Utah Transit Auth. v. Greyhound Lines, Inc.*, 2015 UT 53, ¶ 31, 355 P.3d 947 (explaining that strict construction is a form of contract interpretation where "the court imposes a requirement that certain language must be used to clearly and unequivocally show the parties' intent"). However, no matter how persuasive we might find this argument, our supreme court has rejected it, *see Fort Pierce Indus. Park Phases II, III & IV Owners Ass'n v. Shakespeare*, 2016 UT 28, ¶ 19, 379 P.3d 1218 (stating that "interpretation of restrictive covenants is governed by the same rules of construction as those used to interpret contracts and that, generally, unambiguous restrictive covenants should be enforced as written" (quotation simplified)), and we are of course bound to follow our supreme court's pronouncements, *see Ortega v. Ridgewood Estates, LLC*, 2016 UT App 131, ¶ 30, 379 P.3d 18 ("We are bound by vertical stare decisis to follow strictly the decisions rendered by the Utah Supreme Court." (quotation simplified)). We therefore construe the Restrictions in this case according to the usual rules of contract interpretation.

54 P.3d 1139 ("In interpreting a contract, the intentions of the parties are controlling." (quotation simplified)). Because "the best indication of the parties' intent is the ordinary meaning of the contract's terms," *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994, we look first to the contractual language itself and "consider each contract provision in relation to all of the others, with a view toward giving effect to all and ignoring none," *McNeil Eng'g & Land Surveying, LLC v. Bennett*, 2011 UT App 423, ¶ 8, 268 P.3d 854 (quotation simplified). "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Id.* (quotation simplified).

¶25 The question presented here is whether Part B.3 applies to all buildings within the Subdivision, or whether it is limited in its application to dwellings. For the reasons that follow, we are persuaded by Woodward's argument that Part B.3 applies only to dwellings, and does not apply to his detached Garage.

¶26 We begin our analysis, as we must, by examining the plain meaning of the contractual language. *See id.* Here, not only does Part B.3's heading[7] seem to limit its reach to dwellings, but

---

7. The parties spend considerable energy arguing over the extent to which we are permitted to consider the language of the section heading. Woodward cites Scalia and Garner for the proposition that the "title and headings are permissible indicators of meaning." *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 221 (2012). The Vanderwoods respond by directing our attention to *McEwan v. Mountain Land Support Corp.*, 2005 UT App 240, 116 P.3d 955, a case in which we stated that "contract headings are more appropriately regarded as organizational tools than substantive

(continued…)

the section's text, introductory paragraph, and structure make this point clear. It is noteworthy that the term "dwelling" (or "house" or "home") appears often throughout the entire provision, not just in the title. In particular, the section's prefatory paragraph states that "the intention and purpose of the covenants" is to "assure that all *dwellings*" are of a certain "quality of workmanship and materials." (Emphasis added.) That paragraph uses the term "dwelling" four times. The subparagraphs also focus on residences, discussing the allowable minimum square footage for houses, requiring "dwellings" to be "set on permanent foundations," and mandating that "*houses*" be "finished with brick, stucco or stone on all parts of the *house* exterior." (Emphasis added.)

¶27 The structure of Part B.3 also supports our conclusion. The section (after the heading) begins with an unindented paragraph focused on making sure that all "dwellings" are of a certain "quality of workmanship and materials"; that paragraph ends with a sentence terminating in a colon, followed by a series of indented lettered subparts. Such a structure indicates that the

---

(…continued)
contract provisions," and concluded that "the contract heading is not actually part of the contract." *Id.* ¶ 25. We think *McEwan* is readily distinguishable here, given that, in that case, the paragraph heading was directly at odds with the paragraph's text, whereas here the section heading is completely in harmony with the section's text. We therefore give the section heading some weight in our analysis, *cf. Jensen v. Intermountain Healthcare, Inc.*, 2018 UT 27, ¶ 29, 424 P.3d 885 (stating that "when we need help understanding an ambiguous [statutory] provision, titles are persuasive and can aid in ascertaining the statute's correct interpretation and application" (quotation simplified)), but find it to be something well short of a determining factor here, given the clarity of the section's substantive text.

subparts following the initial paragraph are all related to the prefatory paragraph and its objective. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 156 (2012) (stating that "[m]aterial within an indented subpart relates only to that subpart; material contained in unindented text relates to all of the following or preceding subparts").

¶28    Moreover, the drafters of the Restrictions often used the term "garage" and "other non-inhabited structure" in other sections, demonstrating that they knew how to draft provisions dealing with such structures where that was their intention. *See, e.g.*, *State Farm Mutual Auto. Ins. Co. v. Clyde*, 920 P.2d 1183, 1187 (Utah 1996) (finding that the legislature's omission of a term from a statute was intentional because the same term was used in several other statutes, thus demonstrating that the legislature "knew how to use the term . . . but chose not to do so"); *Nolin v. S & S Constr., Inc.*, 2013 UT App 94, ¶ 16, 301 P.3d 1026 (concluding that the drafters of a contract could "differentiate between the terms 'Lot' and 'Residence'" and had "use[d] each advisedly" where both terms appeared in the same section and both had different definitions); *cf. Pulham v. Kirsling*, 2019 UT 18, ¶ 30 n.9, 443 P.3d 1217 (discussing the "expressio unius principle, . . . which is 'a canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative'" (quotation simplified)). Part B.3 uses the term "garage" four times, each time in reference to garages that are attached to dwellings: once in articulating a requirement that "[a]ll houses shall have an attached garage" big enough for two cars, and three times to emphasize that square footage measurements for dwellings should not include garage space. By contrast, the drafters included elsewhere in the Restrictions (e.g., Part B.4) requirements for non-inhabited buildings, including setback minimums (discussed below) for detached "[g]arage[s] and other non-inhabited structure[s]." Had the drafters wanted

the provisions of Part B.3 to apply to outbuildings and other non-inhabited structures, they could have easily said so.[8]

¶29 The Vanderwoods point out, however, that the specific provisions in Part B.3(f) and B.3(g) that set forth requirements for siding and roofing materials do not use the term "dwelling," and they argue that these provisions—despite their inclusion in a list of items clearly intended to apply only to residential buildings—have broader application. We find this argument unconvincing. The more specific building exterior provision is found in Part B.3(d), which states plainly that "[a]ll houses shall be finished with brick, stucco or stone on all parts of the house exterior." We view Part B.3(f) as simply a clarification of Part B.3(d), making plain that, while house exteriors must be mostly brick, stucco or stone, aluminum or vinyl siding is allowed "in soffit and facia areas." And the provision regarding roofing

---

8. The drafters of restrictive covenants—usually developers—are often well aware that the term "dwelling" has a particular meaning in this context as a structure intended for human habitation, and that such structures are typically subject to much stricter building codes and requirements. As here, the term is often defined by the governing municipality in its ordinances or building code. *See* Weber County, Utah, Code of Ordinances, § 101-1-7 (2013) ("The term 'dwelling' means a building or portion thereof, which is constructed in compliance with the county's adopted building codes and designed as a place for human habitation . . . ."); *see also RJW Media Inc. v. Heath*, 2017 UT App 34, ¶ 16, 392 P.3d 956 (discussing the applicable provisions of the county's building codes and regulations to conclude that "a structure is not considered a 'dwelling' unless it contains cooking facilities" (quotation simplified)). We find it quite unlikely that the drafters of the Restrictions used the term "dwelling" by accident.

materials, even though not specifically limited to dwellings in the particular subsection in which it appears, is part of a long list of things that were, according to the prefatory paragraph, all supposed to "assure that all *dwellings*" be of an acceptable "quality of workmanship and materials." (Emphasis added.)

¶30    In sum, after considering each provision in Part B.3 "in relation to all of the others, with a view toward giving effect to all and ignoring none," it is apparent that the restrictions governing exterior building materials were intended to apply only to dwellings. *See McNeil*, 2011 UT App 423, ¶ 8 (quotation simplified). Neither side contends that the Garage is a dwelling, and therefore Part B.3 does not apply to the Garage. Thus, Woodward did not violate the Restrictions when he built a detached Garage with a metal exterior and a metal roof.

C.    Setback Covenant

¶31    Woodward next argues that the district court erred in granting summary judgment on the Vanderwoods' claim that the Garage is in violation of the Restrictions' setback requirements. Part B.4 of the Restrictions contains setback requirements for all kinds of buildings and structures that might be constructed within the Subdivision. Specifically, with regard to "[g]arage[s] and other non-inhabited structure[s]," the Restrictions require that buildings be set back at least ten feet on the "side yards, along a line paralleling side property lines." The Vanderwoods assert that Woodward's Garage violates this side-yard setback requirement in that it is located only five feet from the property line dividing Woodward's property from that owned by his neighbor to the south.[9] Woodward defends against

---

9. The Garage is located on the part of Woodward's property that is farthest away from his northern neighbors—the Vanderwoods—and closest to his southern neighbor, an

(continued…)

this assertion in two ways. First, he maintains that the Vanderwoods have not sufficiently proven the actual location of the Garage. Second, he claims by way of affirmative defense that the setback covenant contained in the Restrictions has been abandoned and is therefore no longer enforceable against him. We examine each argument in turn.

1

¶32    On a motion for summary judgment the burden of proof "shifts between the party moving for summary judgment and the nonmoving party." *Jones & Trevor Mktg., Inc. v. Lowry*, 2012 UT 39, ¶ 29, 284 P.3d 630; *see also* Utah R. Civ. P. 56. "Where the moving party would bear the burden of proof at trial, the movant must establish each element of his claim in order to show that he is entitled to judgment as a matter of law." *Orvis v. Johnson*, 2008 UT 2, ¶ 10, 177 P.3d 600. The movant must produce "affirmative evidence" that demonstrates "an absence of a genuine issue of material fact." *Salo v. Tyler*, 2018 UT 7, ¶¶ 26, 29, 417 P.3d 581. If the movant does so, then the burden shifts to the nonmoving party "to present evidence that is sufficient to establish a genuine issue of material fact." *Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 31, 54 P.3d 1054. Such evidence must constitute more than a mere "scintilla of evidence," *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, (1986), and must contain "more than just conclusory assertions that an issue of material fact exists," *see Shaw Res. Ltd. v. Pruitt, Gushee & Bachtell, PC*, 2006 UT App 313, ¶ 22, 142 P.3d 560 (quotation simplified).

---

(…continued)

individual who is not a part of this litigation. These circumstances mean that the district court's order, somewhat ironically, commanded Woodward to move his Garage five feet *closer* to the Vanderwoods' property.

¶33   Because the Vanderwoods bear the ultimate burden of proof on the issue of whether the Garage is located in a position that violates the setback requirements, and are also the ones asking for summary judgment on that subject, in order to win summary judgment the Vanderwoods bear the initial burden of demonstrating, through "affirmative evidence," that the Garage does in fact violate the setback requirements. *See Salo*, 2018 UT 7, ¶ 26. In an effort to meet that burden, the Vanderwoods presented multiple pieces of evidence to the district court, including the following: (a) Lorraine Vanderwood's sworn declaration that she had personally "measured the distance between the South fence on [Woodward's] property and the [Garage]," and found it to be five feet, "give or take a few inches"; (b) a sketch prepared for Woodward by Builder that shows the planned setbacks for the Garage as being five feet from an unidentified line; and (c) Builder's sworn affidavit that the sketch was accurate and that "to the best of [Builder's] knowledge" the Garage was constructed "with 5' setbacks . . . as measured from the existing fence lines." This evidence is sufficient to meet the Vanderwoods' initial summary judgment burden, and therefore the burden then shifts to Woodward "to present evidence that is sufficient to establish a genuine issue of material fact." *See Waddoups*, 2002 UT 69, ¶ 31.

¶34   Woodward has not met this burden, because he has produced no substantive evidence to refute the Vanderwoods' evidence. He provides no declaration of his own—or from anyone else—claiming that the distance between the Garage and his neighbor's property is anything other than five feet. He provides no evidence of any kind—expert or lay—to suggest that the Vanderwoods are measuring the distance from the wrong line. Instead, Woodward claims that the Vanderwoods' evidence does not establish that the fence line—from which the Vanderwoods' measurements are taken—is the same line as the actual property line, and asserts that the Vanderwoods' evidence

is therefore insufficient because it does not include an actual survey, or other evidence from an expert, providing the exact location of the Garage. As this court has recognized, such "conclusory assertions" are insufficient to establish that there is a genuine issue for trial. *See Shaw*, 2006 UT App 313, ¶ 22 (quotation simplified). Certainly a survey would be excellent evidence of the Garage's location, and if one of the parties had produced one, it would perhaps be the best evidence to prove or disprove the Vanderwoods' contention. Such evidence may even be entitled to more weight at trial than the Vanderwoods' non-expert evidence. But the Vanderwoods' evidence is nonetheless admissible, and tends to show that the Garage violates the setback requirements, and Woodward has not raised any substantive response to that evidence.

¶35 Because the Vanderwoods have demonstrated through admissible evidence that the Garage was constructed in violation of the Restrictions' setback requirements, and Woodward has failed to counter with any actual evidence to the contrary, we conclude, as a matter of law, that the Garage violates the setback requirements by approximately five feet. Therefore, we affirm the district court's grant of summary judgment on this point in favor of the Vanderwoods. As such, this issue has been conclusively decided, and Woodward will not be allowed, on remand, to relitigate issues relating to the location of the Garage.

2

¶36 Both sides filed summary judgment motions on the question of whether the setback requirements in the Restrictions have been abandoned, and the district court granted the Vanderwoods' motion, determining as a matter of law that the setback requirements had not been abandoned. We conclude that the court's decision on this point was erroneous because, on this record, neither side has established as a matter of law that the setback requirements have (or have not) been abandoned.

¶37 "[A] movant who seeks summary judgment on a claim on which the nonmoving party bears the burden of persuasion may show that there is no genuine issue of material fact without producing its own evidence." *Salo*, 2018 UT 7, ¶ 26. That showing can be made "by reference to the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." *Id.* ¶ 25 (quotation simplified). "Upon such a showing, . . . the burden then shifts to the nonmoving party, who may not rest upon the mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Orvis*, 2008 UT 2, ¶ 18 (quotation simplified).

¶38 Abandonment is an affirmative defense upon which Woodward carries the burden of proof. *See Fink v. Miller*, 896 P.2d 649, 653 (Utah Ct. App. 1995) (stating that "the party opposing enforcement" of the restrictive covenant bears the burden of proving that the covenant has been abandoned). With regard to their summary judgment motion on the issue of abandonment, the Vanderwoods had the initial burden, as movants, to demonstrate the absence of a genuine issue of material fact, but they have not carried that burden in this case. Indeed, in response to Woodward's contention that the "side and rear setback requirements have been routinely disregarded in [the S]ubdivision," the Vanderwoods have acknowledged that "there are a handful of" homeowners in the Subdivision who "have violated the side yard setback requirements." The record contains little additional evidence on this issue. Without additional evidence to contextualize it, the Vanderwoods' concession alone constitutes sufficient evidence to foreclose a ruling, as a matter of law, that the setback requirements have not been abandoned. There are only twenty-three lots in the Subdivision and, while the record does not disclose how many lots are included in the Vanderwoods' "handful" concession, even if it is just four, that would constitute over one-sixth of the

Subdivision. *See id.* at 653–54 (holding that visible violations by "[t]wenty-three out of eighty-one" homeowners—some 28%—was sufficient to constitute abandonment as a matter of law). The record also does not disclose how egregious these "handful" of violations are—whether the buildings in question violate the setback requirements by one inch or nine feet—or how apparent they would be to a reasonable observer. *See id.* at 653 (stating that a requirement has been abandoned when "existing violations are so great as to lead the mind of the average person to reasonably conclude that the restriction in question has been abandoned" (quotation simplified)).

¶39 But we do not think Woodward is entitled to summary judgment on this issue either, at least not on the record before us. With regard to his cross-motion, Woodward is both the movant as well as the party who will bear the ultimate burden of persuasion at trial, and therefore to win summary judgment on the issue of abandonment, Woodward must make "a sufficient showing on elements on which [he] has the burden of proof." *See Salo*, 2018 UT 7, ¶ 24 (quotation simplified). Thus, to prove entitlement to summary judgment on this issue, Woodward must show that the "existing violations are so great as to lead the mind of the average person to reasonably conclude that the restriction in question has been abandoned." *See Fink*, 896 P.2d at 653 (quotation simplified). Relevant to this inquiry are "(1) the number, nature and severity of the then existing violations; (2) any prior act of enforcement of the restriction; and (3) whether it is still possible to realize to a substantial degree the benefits intended through the covenant." *Swenson v. Erickson*, 2000 UT 16, ¶ 27, 998 P.2d 807 (quotation simplified).

¶40 Woodward put forth only a scant amount of evidence to support his claim. Indeed, Woodward's key piece of evidence is the Vanderwoods' concession that "there are a handful of other owners that have also violated the side yard setback." While this piece of evidence is enough to prevent summary judgment on

this issue *against* him, it is insufficient to support entry of summary judgment in his favor. As noted, the record before us tells us nothing about the actual number of setback violations in the Subdivision, nor their relative severity.[10] While there is no indication that any homeowner in the Subdivision, prior to this lawsuit, ever raised any objection to any other homeowner's construction project on the basis of a perceived setback violation, the record likewise does not disclose whether "it is still possible to realize to a substantial degree the benefits intended through the covenant." *See id.* (quotation simplified).

¶41    In the end, we are unpersuaded that, on this record, either side is entitled to judgment as a matter of law on the question of whether the homeowners of the Subdivision have abandoned the side yard setback requirements contained in the Restrictions. The record before us simply does not contain enough information on this point to justify summary judgment either way. We therefore reverse the district court's entry of summary judgment on this issue in favor of the Vanderwoods, and remand for further proceedings. On remand, it will be up to the district court to determine the form those proceedings take, and to decide whether further motion practice, additional discovery, or simply a trial is in order.

## II.  Injunctive Relief

¶42    Because we have determined that the Garage's metal exterior and metal roof do not violate the Restrictions, and that the district court erred in deciding as a matter of law that the

10. The record does contain photographs depicting some of the alleged setback violations, but those photographs come unaccompanied by measurements or other identifying evidence demonstrating whether the alleged violations actually exist, much less their severity.

setback covenant had not been abandoned, we must vacate the district court's order commanding Woodward to "disassemble[]" the Garage and, if rebuilt, to build it five feet closer to the Vanderwoods' property and with different materials. That order was founded on incorrect premises, and can no longer stand.

¶43    But we stop short of conclusively determining that the Vanderwoods can never obtain an injunction in this case. We have determined that Woodward does not need to obtain ACC approval for his Garage, and that he may build his detached Garage out of metal without violating the Restrictions. But it remains to be seen whether the Garage—which is apparently located only five feet from Woodward's south property line—violates an enforceable and non-abandoned provision of the Restrictions. If it is determined, on remand, that the setback provisions have been abandoned, then the Vanderwoods will not be entitled to any kind of relief, let alone injunctive relief. But if it is determined, on remand, that the setback provisions have not been abandoned, then the Garage violates the Restrictions, and the district court will then be required to determine whether to order Woodward to tear down the Garage and move it at least five feet to the north. We therefore offer the following analysis regarding the possibility of injunctive relief, to guide the district court should the matter arise on remand. *See State v. James*, 819 P.2d 781, 795 (Utah 1991) ("Issues that are fully briefed on appeal and are likely to be presented on remand should be addressed by this court.").

¶44    A district court enjoys "broad discretion to enter injunctions, especially in the context of restrictive covenants." *South Ridge Homeowners' Ass'n v. Brown*, 2010 UT App 23, ¶ 6, 226 P.3d 758. "However, the right to an equitable remedy is an exceptional one," and even in the restrictive covenant context, "absent statutory mandate, equitable relief should be granted only when a court determines that damages are inadequate and

that equitable relief will result in more perfect and complete justice." *Smith v. Simas*, 2014 UT App 78, ¶ 14, 324 P.3d 667 (quotation simplified). Thus, injunctive relief is not automatic, even if a violation of the restrictive covenants has already been established. In that situation, courts employ a "balancing of equities test" to determine whether to order injunctive relief to remedy the violation. *See Carrier v. Lindquist*, 2001 UT 105, ¶ 31, 37 P.3d 1112. Under this test, the district court

> has discretion not to grant an injunction for violation of a restrictive covenant if the violation by the defendant was innocent, the cost of curing the violation would be disproportionate to the benefit realized, the injury to the plaintiff can be adequately compensated with damages, and the violation does not cause irreparable injury to the plaintiff.

*Smith*, 2014 UT App 78, ¶ 16. However, "because the application of this doctrine is reserved for the innocent defendant, the determination whether the defendant's violation was innocent is a threshold issue." *Id.* (quotation simplified).

¶45 In *Smith*, we specifically considered whether the defendants' violations of the relevant restrictive covenants were innocent where the defendants were aware that the plaintiffs believed that the defendants' actions were in violation of the covenants, and that the plaintiffs had complained to the city and the relevant homeowners association (HOA). *Id.* ¶ 17. The court concluded that—despite knowledge of their neighbors' opposition—the defendants "attempted to comply with the [covenants] in good faith," in part because the defendants had obtained approval for their project, before construction commenced, from both the HOA and the city, and the HOA and the city refused to withdraw that approval even after learning of the plaintiffs' complaints. *Id.* Thus, despite the defendants'

awareness of the plaintiffs' opposition, and despite a jury's later determination that the defendants had in fact violated the covenants, we held that their violations were innocent because, "[g]iven these authoritative rejections of the [plaintiffs'] complaints during the planning and construction process," the complaints "were insufficient to give the [defendants] knowledge or warning that they were encroaching upon another's property rights." *Id.* (quotation simplified).

¶46    In the present case, the district court refused to apply a balancing of equities test, concluding that, even though Woodward had "consulted with the local building inspector about the restrictive covenants" and the city had approved his plans and issued a building permit, Woodward was not an "innocent defendant" because he "had knowledge that he was encroaching on another's property rights" and elected to "roll[] the dice." But we cannot find any meaningful distinction between *Smith* and the situation presented in this case, and therefore we agree with Woodward that the district court's analysis was incorrect. In both this case and *Smith*, the defendant attempted to comply with the relevant rules and restrictions. Indeed, in both cases the defendant applied for, and received, a building permit from the city based on the construction plans. And in both cases, although the defendant was aware of a neighbor's belief that the plan violated the restrictions, such general awareness of a complaint does not necessarily indicate knowledge that the plans actually violate the restrictions.

¶47    One potential difference between *Smith* and this case is that, in *Smith*, the defendant actually did obtain HOA approval for the proposed construction, while Woodward did not. But the district court determined that any requirement that Woodward obtain ACC approval before beginning construction had been abandoned and, as noted above, no party challenges that determination on appeal. This distinction is therefore not material. In both this case and *Smith*, the defendants proceeded

with a good faith belief that the actions they were taking complied with applicable rules. In *Smith*, that belief turned out to be wrong; indeed, a jury later found the defendants had violated three provisions of the covenants. *See id.* ¶ 8. In this case, Woodward's good faith belief may turn out to be wrong in the end, in the event that it is later determined, on remand, that the setback requirements have not been abandoned.[11] But whether a judge or jury later determines that a violation exists is not the relevant inquiry here; instead, the inquiry should be appropriately focused on the good (or bad) faith nature of the defendant's belief at the time construction commenced.

¶48    In short, we are unable to meaningfully distinguish *Smith* from this case. If the homeowner in *Smith* was an innocent defendant entitled to have the court undertake a balancing of equities before entering an injunction, then so is Woodward. Accordingly, we determine as a matter of law, on this record, that Woodward is an "innocent defendant" who has met the threshold requirement for application of a balancing of equities test, and we instruct the district court that, if it is later determined that the setback requirements have not been abandoned, it is to undertake a balancing of equities analysis before issuing injunctive relief in favor of the Vanderwoods.

### III.  Attorney Fees

¶49    Finally, Woodward challenges the district court's award of attorney fees to the Vanderwoods as the prevailing party. Under Utah law, "[i]f attorney fees are provided for by contract the fees are awarded in accordance with the terms of that

---

11. The district court vindicated Woodward's belief that the ACC-approval provision had been abandoned, and we have, in this opinion, similarly vindicated Woodward's belief that his metal Garage did not violate Part B.3.

contract." *TS 1 P'ship v. Allred*, 877 P.2d 156, 160 (Utah Ct. App. 1994). Here, the Restrictions specifically provide that "[i]n any action to enforce [the Restrictions] the prevailing party shall be entitled to an award of reasonable attorney's fees and costs incurred in prosecuting such action." Accordingly, any award of attorney fees is dependent on a determination of which party prevailed, which is "a decision left to the sound discretion of the [district] court." *Larry J. Coet Chevrolet v. Labrum*, 2008 UT App 69, ¶ 16, 180 P.3d 765 (quotation simplified). Based on the district court's ruling, the Vanderwoods certainly prevailed before the district court. But we have determined that the district court's ruling was in several respects erroneous, and therefore deem it necessary to vacate that court's "prevailing party" determination as well as its award of attorney fees to the Vanderwoods. At the conclusion of the proceedings on remand, the district court should reassess the "prevailing party" issue and award attorney fees as appropriate at that time. *See Cantrell v. Cantrell*, 2013 UT App 296, ¶ 22 n.6, 323 P.3d 586 ("[B]ecause we reverse the district court's order and remand for further proceedings, the district court may reevaluate [the appellee's] request for attorney fees upon entering judgment at the conclusion of those proceedings.").

CONCLUSION

¶50 As a matter of law, Woodward does not need to seek ACC approval for his Garage, because no ACC has ever functioned in the Subdivision and that requirement has been abandoned, including any requirement that building projects be reviewed for their level of "harmony" with the neighborhood. As a matter of law, Part B.3 of the Restrictions applies only to dwellings, and because the Garage is not a dwelling, that provision does not apply to Woodward's Garage. As a matter of law, the Garage is out of compliance with Part B.4, which requires a ten-foot setback along the side yard for any garages,

but there remains an unresolved factual issue about whether the setback provision has been abandoned. We therefore reverse the district court's summary judgment order, vacate its injunction, and remand this case for further proceedings. If it is determined, after those further proceedings, that the setback provision has not been abandoned, the district court should employ a balancing of equities in determining whether to impose injunctive relief for the setback violation. Finally, we vacate the district court's order granting attorney fees to the Vanderwoods as the prevailing party, and instruct the court to reassess appropriate attorney fees following the conclusion of proceedings on remand.

———————